# EXHIBIT A

**BALABAN & SPIELBERGER, LLP**
11999 San Vicente Blvd., Suite 345
Los Angeles, CA  90049
Tel:     (424) 832-7677
Fax:     (424) 832-7702
Daniel K. Balaban, State Bar No. 243652
    *daniel@dbaslaw.com*
Andrew J. Spielberger, State Bar No. 120231
    *andrew@dbaslaw.com*
Kahren Harutyunyan, State Bar No. 298449
    *kahren@dbsalaw.com*

Attorneys for Plaintiff, KAYLA DAVIS HORTON

Electronically FILED by
Superior Court of California,
County of Los Angeles
11/01/2024 2:30 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By D. Gallegos, Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| KAYLA DAVIS HORTON; The Estate of Michael Andrew Horton, administered by Kayla Davis Horton,<br><br>        Plaintiff,<br><br>   v.<br><br>3M COMPANY; E. I. DUPONT DE NEMOURS & CO.; THE CHEMOURS COMPANY; ARCHROMA U.S., INC.; ARKEMA INC.; AGC CHEMICALS AMERICAS, INC.; DAIKIN AMERICA, INC.; DYNAX CORPORATION; JOHNSON CONTROLS, INC.; TYCO FIRE PRODUCTS, L.P.; CHEMGUARD, INC.; NATIONAL FOAM, INC.; CARRIER GLOBAL CORPORATION; KIDDE-FENWAL, LLC; PERIMETER SOLUTIONS LP; FIRE SERVICE PLUS, INC.; BUCKEYE FIRE EQUIPMENT COMPANY; AMEREX CORPORATION; MINE SAFETY APPLIANCE COMPANY, LLC; GLOBE MANUFACTURING COMPANY LLC; LION GROUP, INC.; W. L. GORE & ASSOCIATES, INC.; TENCATE PROTECTIVE FABRICS USA D/B/A SOUTHERN MILLS INC.; PBI PERFORMANCE PRODUCTS, INC.; HONEYWELL SAFETY PRODUCTS USA, INC.; STEDFAST USA; L.N. | Case No.  24NNCV05524<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. **STRICT LIABILITY - DESIGN DEFECT**<br>2. **STRICT LIABILITY – FAILURE TO WARN**<br>3. **NEGLIGENCE**<br>4. **WRONGFUL DEATH**<br>5. **SURVIVAL ACTION**<br>6. **LOSS OF CONSORTIUM**<br><br>**DEMAND FOR JURY TRIAL** |

1  CURTIS AND SONS; ALLSTAR FIRE
   EQUIPMENT CO.; MALLORY SAFETY
2  AND SUPPLY LLC; MUNICIPAL
   EMERGENCY SERVICES INC., and
3  DOES 1-100,

4          Defendants.

5

6

7                          **COMPLAINT**

8          Plaintiffs KAYLA DAVIS HORTON and The Estate of Michael Andrew Horton,

9  administered by Kayla Davis Horton by and through their attorneys of record, allege as follows:

10                         **INTRODUCTION**

11         1.      Plaintiffs are KAYLA DAVIS HORTON, the widow of the former Assistant County

12 Fire Chief and the Fire Marshal for County of San Bernardino, Michael Andrew Horton ("MRS.

13 HORTON"), and The Estate of Michael Andrew Horton, administered by Kayla Davis Horton, (the

14 "HORTON ESTATE") (collectively "PLAINTIFFS") Michael Andrew Horton worked in various

15 fire stations, engine, truck, and specialized companies in the Riverside, San Bernardino and the

16 surrounding Counties for decades starting in 1980. Mr. Horton had been in the fire service for 40

17 years, before he was diagnosed with cancer around May of 2021. Mr. Horton started his firefighting

18 career in 1980 with the Fire Department of Norco, California. He also worked for the Riverside

19 County Fire Department, among other agencies, before becoming Deputy Fire Marshal in San

20 Bernardino County in 2006 and the Fire Marshal for County of San Bernardino in 2013. From 1984

21 until about 1989, Mr. Horton continued his service at the California Depart of Corrections Fire

22 Department, in Chino, California. Mr. Horton continued serving in multiple departments, including

23 at Agnew Fire Department, in San Jose, California, Crafton Fire Department, in Yucaipa, California

24 and Temecula Fire Department, all the way until 2012. From 2012 until the time of his passing, Mr.

25 Horton worked for the County of San Bernardino Fire Department, serving as the Assist Fire Chief

26 and the County Fire Marshall.

27 ///

28 ///

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

2
COMPLAINT

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

2.      Throughout his decades of training, service, continued certification and re-certification and heroic actions, Mr. Horton routinely wore turnouts and used Class B firefighting foam. He was unaware that the turnouts he wore, and the Class B foam he used contained PFAS or PFAS-containing materials. (The deceased Michael Andrew Horton will hereinafter be referred to as "MR. HORTON" or "FIRE MARSHAL HORTON")

3.      PLAINTIFFS bring this action for monetary damages and appropriate equitable and injunctive relief for harm resulting from exposure to per- and polyfluoroalkyl substances ("PFAS") that marketed, sold, supplied, distributed and/or contained in products were designed, manufactured, marketed, sold, supplied and/or distributed by each of the Defendants, individually or through their predecessors or subsidiaries.

4.      PFAS are human-made chemicals consisting of a chain of carbon and fluorine atoms used in manufactured products to, *inter alia*, resist and repel oil, stains, heat and water. PFAS include "long-chain" PFAS made up of seven or more carbon atoms ("long-chain PFAS") as well as "short-chain" PFAS made up of six or fewer carbon atoms ("short-chain PFAS").

5.      PFAS are known as "forever chemicals" because they are immune to degradation, bio-accumulate in individual organisms and humans, and increase in concentration up the food chain. PFAS exposure to humans can occur through inhalation, ingestion and dermal contact.[1]

6.      PFAS have been associated with multiple and serious adverse health effects in humans including cancer, tumors, liver damage, immune system and endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy-induced hypertension. PFAS have also been found to concentrate in human blood, bones and organs and, most recently, to reduce the effectiveness of vaccines, a significant concern in light of COVID-19.

7.      Unbeknownst to the brave firefighters throughout the United States, including in California, the Defendants have designed, manufactured, marketed, sold, supplied and/or distributed, or used PFAS and PFAS-containing materials in protective clothing specifically designed for

---

[1] Suzanne E. Fenton, MS, PhD, *PFAS Collection*, Environmental Health Perspectives (February 22, 2019), https://ehp.niehs.nih.gov/curated-collections/pfas.

firefighters ("turnouts") and in Class B firefighting foams ("Class B foam").[2]

8.    For decades, Defendants were aware of the toxic nature of PFAS and the harmful impact these substances have on human health. Yet, Defendants manufactured, designed, marketed, sold, supplied, or distributed PFAS and PFAS chemical feedstock,[3] as well PFAS-containing turnouts and Class B foam, to firefighting training facilities and fire departments nationally, including in California and in Santa Clara County. Defendants did so, moreover, without ever informing firefighters or the public that their turnouts and Class B foams contained PFAS, and without warning firefighters or the public of the substantial and serious health injuries that can result from exposure to PFAS or PFAS-containing materials.

9.    FIRE MARSHAL HORTON wore turnouts and used Class B foam in the usual and normal course of performing his firefighting duties and training for decades and was repeatedly exposed to PFAS in his workplace through multiple departments. He did did not know and, in the exercise of reasonable diligence, could not have known that these products contained PFAS or PFAS-containing materials. FIRE MARSHAL HORTON also did not know that PFAS penetrated into his body and his blood.

10.    Meanwhile, at all relevant times and continuing to the present, Defendants have represented that their turnouts and Class B foams are safe.

11.    MR. HORTON used the turnouts and Class B foam as they were intended and in a foreseeable manner which exposed him to PFAS in the course of his firefighting service. This repeated and extensive exposure to PFAS resulted in MR. HORTON being diagnosed with cancer on or around May 2021 and ultimately dying from cancer on November 2, 2022.

12.    Defendants knowingly and willfully designed, manufactured, marketed, sold, and distributed chemicals and/or products containing PFAS for use within the State of California, and the Counties of Los Angeles, Riverside, and San Bernardino, when they knew or reasonably should have known that firefighters throughout California, including in the Counties of Los Angeles, Riverside,

---

[2] Class B foams are synthetic "soap-like" foams that spread rapidly across the surface of a fuel or chemical fire to stop the formation of flammable vapors. The most common Class B foam is aqueous film-forming foam (or "AFFF").

[3] Chemical feedstock refers to a chemical used to support a large-scale chemical reaction. The PFAS chemicals utilized to manufacture products containing PFAS are generally referred to herein as "chemical feedstock."

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

and San Bernardino, including FIRE MARSHAL HORTON would repeatedly inhale, ingest and/or have dermal contact with these harmful compounds during firefighting training exercises and in firefighting emergencies, and that such exposure would threaten the health and welfare of firefighters, including the health and welfare of FIRE MARSHAL HORTON, when exposed to these dangerous and hazardous chemicals.

13.    PLAINTIFFS bring this action against Defendants and seek damages, together with any appropriate injunctive or other equitable relief.

### PARTIES TO THE ACTION

**PLAINTIFFS**

**A.  KAYLA DAVIS HORTON; The Estate of Michael Andrew Horton, administered by Kayla Davis Horton**

14.    Plaintiff MRS. HORTON is the widow of FIRE MARSHAL HORTON and the administrator of the HORTON ESTATE. MR. and MRS. HORTON were legally married at the time of MR. HORTON's death. MRS. HORTON is the only wrongful death heir of the deceased FIRE MARSHAL HORTON.

15.    MRS. HORTON is also the only successor in interest to the HORTON ESTATE.

**DEFENDANTS**

16.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant 3M Company (a/k/a Minnesota Mining and Manufacturing Company) ("3M") is a Delaware corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Riverside and San Bernardino Counties in California. 3M has its principal place of business in St. Paul, Minnesota. 3M developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Riverside and San Bernardino Counties in California.

17.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant E. I. du Pont de Nemours & Co. ("DuPont") is a Delaware corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Riverside and

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

San Bernardino Counties in California. DuPont has its principal place of business in Wilmington, Delaware. DuPont developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Riverside and San Bernardino Counties in California.

18.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant The Chemours Company, L.L.C. ("Chemours") is a Delaware corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Riverside and San Bernardino Counties in California. Chemours has its principal place of business in Wilmington, Delaware. Chemours developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Riverside and San Bernardino Counties in California.

19.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant Archroma U.S., Inc. ("Archroma") is a North Carolina corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Riverside and San Bernardino Counties in California. Archroma has its principal place of business in Charlotte, North Carolina. Archroma developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Riverside and San Bernardino Counties in California.

20.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant Arkema Inc. ("Arkema") is a Pennsylvania corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Riverside and San Bernardino Counties in California. Arkema has its principal place of business in King of Prussia, Pennsylvania. Arkema developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Riverside and San Bernardino Counties in California.

21.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant AGC

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

Chemicals Americas, Inc. ("AGC") is a Delaware corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Riverside and San Bernardino Counties in California. AGC has its principal place of business in Exton, Pennsylvania. AGC developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Riverside and San Bernardino Counties in California.

22.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant Daikin America, Inc. ("Daikin America") is a Delaware corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Riverside and San Bernardino Counties in California. Daikin America has its principal place of business in Orangeburg, New York. Daikin America developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Riverside and San Bernardino Counties in California.

23.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant Dynax Corporation ("Dynax") is a New York corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Riverside and San Bernardino Counties in California. Dynax has its principal place of business in Pound Ridge, New York. Dynax developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Riverside and San Bernardino Counties in California.

24.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant Johnson Controls, Inc. ("Johnson Controls") is a Delaware corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Riverside and San Bernardino Counties in California. Johnson Controls has its principal place of business in Milwaukee, Wisconsin. Johnson Controls is the parent of Defendants Tyco Fire Products, LP and Chemguard, Inc. Johnson Controls developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams,

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD, STE. 345
LOS ANGELES, CA 90049

including in California, and within Los Angeles, Riverside and San Bernardino Counties in California.

25.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant Tyco Fire Products, L.P. ("Tyco") is a Delaware corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Riverside and San Bernardino Counties in California. Tyco has its principal place of business in Exeter, New Hampshire. Tyco developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Riverside and San Bernardino Counties in California.

26.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant Chemguard, Inc. ("Chemguard") is a Wisconsin corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Riverside and San Bernardino Counties in California. Chemguard has its principal place of business in Marinette, Wisconsin. Chemguard developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Riverside and San Bernardino Counties in California.

27.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant National Foam, Inc., ("National Foam") is a Pennsylvania corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Riverside and San Bernardino Counties in California. National Foam has its principal place of business in West Chester, Pennsylvania. National Foam developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Riverside and San Bernardino Counties in California.

28.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant Carrier Global Corporation ("Carrier") is a Delaware corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Riverside and San Bernardino Counties in California. Carrier has its principal place of business in Palm Beach Gardens,

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

Florida. Carrier is the parent of Defendant Kidde-Fenwal, Inc. Carrier developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Riverside and San Bernardino Counties in California.

29.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a Delaware corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Riverside and San Bernardino Counties in California. Kidde-Fenwal has its principal place of business in Ashland, Massachusetts. Kidde-Fenwal developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Riverside and San Bernardino Counties in California.

30.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant Perimeter Solutions LP, ("Perimeter Solutions") is a Delaware corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Riverside and San Bernardino Counties in California. Perimeter Solutions has a principal place of business in Rancho Cucamonga, California. Perimeter developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Riverside and San Bernardino Counties in California.

31.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant Fire Service Plus, Inc. ("Fire Service Plus") is a Georgia corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Riverside and San Bernardino Counties in California. Fire Service Plus has its principal place of business in Simi Valley, California. Fire Service Plus developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Riverside and San Bernardino Counties in California.

32.     PLAINTIFFS are informed and believe, and thereupon allege that Defendant Buckeye Fire Equipment Company ("Buckeye") is a North Carolina corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Riverside and San Bernardino Counties in California. Buckeye has its principal place of business in Kings Mountain, North Carolina. Buckeye developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Riverside and San Bernardino Counties in California.

33.     PLAINTIFFS are informed and believe, and thereupon allege that Defendant Amerex Corporation, also known as Alabama Amerex Corporation, ("Amerex") is an Alabama corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Riverside and San Bernardino Counties in California. Amerex has its principal place of business in Trussville, Alabama. Amerex developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Riverside and San Bernardino Counties in California.

34.     PLAINTIFFS are informed and believe, and thereupon allege that Defendant Mine Safety Appliance Company, LLC ("MSA/Globe") is a Pennsylvania corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Riverside and San Bernardino Counties in California. MSA has its principal place of business in Cranberry Township, Pennsylvania. MSA acquired Globe Holding Company, LLC and its subsidiaries (collectively, "MSA/Globe") in 2017 and continues to do business under the Globe name. MSA developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Riverside and San Bernardino Counties in California.

35.     PLAINTIFFS are informed and believe, and thereupon allege that Defendant Globe Manufacturing Company LLC ("Globe") is a New Hampshire corporation that does business throughout the United States, including conducting business in California, and within Los Angeles,

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

Riverside and San Bernardino Counties in California. Globe has its principal place of business in Pittsfield, New Hampshire. Globe developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Riverside and San Bernardino Counties in California. Defendant Mine Safety Appliance Company acquired Globe Holding Company, LLC and its subsidiaries (collectively, "MSA/Globe") in 2017 and continues to do business under the Globe name.

36.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant Lion Group, Inc., ("Lion") is an Ohio corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Riverside and San Bernardino Counties in California. Lion has its principal place of business in Dayton, Ohio. Lion developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Riverside and San Bernardino Counties in California.

37.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant W. L. Gore & Associates, Inc., ("Gore") is a Delaware corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Riverside and San Bernardino Counties in California. Gore has its principal place of business in Newark, Delaware. Gore developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Riverside and San Bernardino Counties in California.

38.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant TenCate Protective Fabrics USA d/b/a Southern Mills, Inc. ("Tencate") is a Georgia corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Riverside and San Bernardino Counties in California. Tencate has its principal place of business in Senoia, Georgia. Tencate developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Riverside and San Bernardino Counties in

11

1    California.

2    39.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant PBI

3    Performance Products, Inc., ("PBI") is a Delaware corporation that does business throughout the

4    United States, including conducting business in California, and within Los Angeles, Riverside and

5    San Bernardino Counties in California. PBI has its principal place of business in Charlotte, North

6    Carolina. PBI developed, manufactured, marketed, distributed, released, sold, and/or used PFAS,

7    PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in

8    California, and within Los Angeles, Riverside and San Bernardino Counties in California.

9    40.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant

10   Honeywell Safety Products USA, Inc. ("Honeywell") is a Delaware corporation that does business

11   throughout the United States, including conducting business in California, and within Los Angeles,

12   Riverside and San Bernardino Counties in California. Honeywell has its principal place of business

13   in Charlotte, North Carolina. Honeywell developed, manufactured, marketed, distributed, released,

14   sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B

15   foams, including in California, and within Los Angeles, Riverside and San Bernardino Counties in

16   California.

17   41.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant StedFast

18   USA ("StedFast") is a Delaware corporation that does business throughout the United States,

19   including conducting business in California, and within Los Angeles, Riverside and San Bernardino

20   Counties in California. StedFast has its principal place of business in Piney Flats, Tennessee. StedFast

21   developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials,

22   and products containing PFAS in turnouts and/or Class B foams, including in California, and within

23   Los Angeles, Riverside and San Bernardino Counties in California.

24   42.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant L.N.

25   Curtis and Sons ("LN Curtis") is a California corporation that does business in California, and within

26   Los Angeles, Riverside and San Bernardino Counties in California. LN Curtis has its principal place

27   of business is Walnut Creek, California. LN Curtis developed, manufactured, marketed, distributed,

28   released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA  90049

Class B foams, including in California, and within Los Angeles, Riverside and San Bernardino Counties in California.

43.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant AllStar Fire Equipment Co. ("AllStar") is a California corporation that does business in California, and within Los Angeles, Riverside and San Bernardino Counties in California. AllStar has its principal place of business in Arcadia, California. AllStar developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Riverside and San Bernardino Counties in California.

44.    PLAINTIFFS are informed and believe, and thereupon allege that Mallory Safety and Supply LLC ("Mallory") is a California corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Riverside and San Bernardino Counties in California. Mallory has its principal place of business in Longview, Washington. Mallory developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Riverside and San Bernardino Counties in California.

45.    PLAINTIFFS are informed and believe, and thereupon allege that Municipal Emergency Services, Inc. ("MES") is a Nevada corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Riverside and San Bernardino Counties in California. MES has its principal place of business in Santa Fe Springs, California. MES developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Riverside and San Bernardino Counties in California.

46.    The true names and/or capacities, whether individual, corporate, associate or otherwise of defendants DOES 1 - 100, inclusive, and each of them, are unknown to PLAINTIFFS, who therefore sue said defendants by such fictitious names. PLAINTIFFS are informed and believe, and thereupon allege, that each defendant fictitiously named herein as a DOE was legally responsible, negligently or in some other actionable manner, for the events and happenings hereinafter referred to and proximately thereby

caused the injuries, emotional pain and suffering, as well as economic damages to PLAINTIFFS as hereinafter alleged. PLAINTIFFS will ask leave of court to amend the complaint to insert the true names and/or capacities of such fictitiously named defendants when the same have been ascertained.

47.    PLAINTIFFS are currently unaware of the true names and capacities of Defendants named herein as DOES 1-100, inclusive, and PLAINTIFFS therefore sue those Defendants by fictitious names pursuant to California Code of Civil Procedure § 474. PLAINTIFFS will amend this complaint to state the true names and capacities of those Defendants sued herein as DOES when ascertained. PLAINTIFFS allege that each fictitiously named Defendant is in some manner responsible for the acts alleged herein and that they proximately caused the injuries to PLAINTIFFS as alleged herein.

48.    PLAINTIFFS are informed and believe, and thereupon allege, that at all times mentioned herein, DEFENDANTS, and each of them, including DOES 1 - 100, were the agents, servants, employees and/or joint venturers of their co-defendants and were, as such, acting within the course, scope and authority of said agency, employment and/or venture and that each and every DEFENDANTS, as aforesaid, when acting as a principal, was negligent in the selection and hiring of each and every other DEFENDANTS as an agent, employee and/or joint venturers were involved in the design, development, manufacture, testing, packaging, promotion, marketing, advertising, distribution, labeling, and/or sale of PFAS, PFAS materials, and products containing PFAS in the turnouts and/or Class B foams that firefighters, including FIRE MARSHAL HORTON, used, as alleged herein.

49.    PLAINTIFFS allege that each named Defendant is in some manner responsible for the acts alleged herein and that they proximately caused the injuries to PLAINTIFFS, as alleged herein.

50.    PLAINTIFFS allege that each named Defendant derived substantial revenue from the PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams that Defendants designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, labeled and/or sold within California, , and within Los Angeles, Riverside and San Bernardino Counties in California, and that were used by firefighter within Los Angeles, Riverside and San Bernardino Counties in California, including by FIRE MARSHAL HORTON, throughout

1    his decorated career.

2        51.    Defendants expected or should have expected their acts to have consequences within

3    the State of California, and derived substantial revenue from interstate commerce.

4        52.    Defendants purposefully availed themselves of the privilege of conducting activities

5    within the State of California, thus invoking the benefits and protections of its laws.

6                              **JURISDICTION AND VENUE**

7        53.    This Court has jurisdiction over this action under the California Code of Civil

8    Procedure § 410.10 and Article VI, § 10 of the California Constitution. The injuries and damages

9    alleged herein are in an amount within the jurisdiction of this Court.

10       54.    The California Superior Court has jurisdiction over all DEFENDANTS, including DOES

11   1-100, because, based on information and belief, each is either a corporation and/or entity and/or person

12   organized under the laws of or having its principal place of business in the State of California, a foreign

13   corporation or association authorized to do business in California and registered with the California

14   Secretary of State, or that has sufficient minimum contacts in California, is a citizen of California, or

15   otherwise has intentionally availed itself of the California market so as to render the exercise of

16   jurisdiction over it by the California courts consistent with traditional notions of fair play and substantial

17   justice.

18       55.    Further, DEFENDANTS, including DOES 1-100, have each purposefully availed

19   themselves of the benefits and protections of the laws within the State of California. DEFENDANTS,

20   including DOES 1-100, conduct substantial business in California and have had sufficient contacts

21   with California such that the exercise of jurisdiction would be consistent with the traditional notions

22   of fair play and substantial justice.

23       56.    FIRE MARSHAL HORTON exposure and PLAINTIFFS' injuries, resulting from the

24   acts of Defendants alleged herein, throughout Los Angeles, and/or Riverside and/or San Bernardino

25   Counties, in California. Venue is also proper is this Court under California Code of Civil Procedure

26   § 395(a), because Defendant AllStar is a California corporation, with its principal place of business

27   in Arcadia, California, within the County of Los Angeles.

28   ///

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA. 90049

## SUBSTANTIVE ALLEGATIONS

### A. FIRE MARSHAL HORTON's Exposure to PFAS-Containing Products

57.      FIRE MARSHAL HORTON has served the communities in Los Angeles, Riverside and San Bernardino Counties firefighter, engineer, lieutenant, captain, battalion chief, assistant chief, deputy chief, chief and fire marshal. FIRE MARSHAL HORTON worked in various fire stations, engines, and specialized companies in some of the largest counties in the United States, both by their size and population.

58.      As a first responder to fire, hazardous materials incidents, and other emergency and medical calls, FIRE MARSHAL HORTON risked his health and safety on daily basis. FIRE MARSHAL HORTON not only saved lives and homes, he provided emergency services and medical care, performed rescue operations, and offered support to people in life-threatening circumstances. For his protection, FIRE MARSHAL HORTON wore turnouts and received extensive and ongoing training in fire suppression (including the preparation and use of Class B foam), fire prevention, rescue, and emergency medical care action to protect and/or minimize the loss of life, property, and damage to the environment.

59.      For decades, Defendants, either individually or through their predecessors or subsidiaries, have manufactured, designed, sold, supplied, and distributed chemical feedstock and/or turnouts and Class B foam containing PFAS to firefighting training facilities and fire departments globally, including within the State of California and the Cities of Riverside and San Bernardino and neighboring communities in California.

60.      With over 5,000 individual chemicals, PFAS is a large and ever-growing category of human-made chemicals, consisting of a nearly indestructible chain of carbon and fluorine atoms that are widely used in products to, *inter alia*, resist and repel oil, heat and water, and have been found to have negative health effects. As detailed below, these toxic chemicals are present in firefighter turnouts and Class B foam.

### (1) PFAS-Containing Turnout Gear

61.      During firefighting training and when responding to fires and performing fire extinguishment, firefighters wear turnouts that are intended to provide a degree of thermal, chemical,

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD, STE. 345
LOS ANGELES, CA 90049

and biological protection for a firefighter. Turnout gear components include a helmet, hood, jacket, pants, boots, and gloves. Each component is made of an outer layer, as well as several inner layers that include a moisture barrier and thermal liner which are meant to protect the firefighter from ambient heat.[4]

62.    PFAS chemicals are used in turnout gear to impart heat, water, and stain resistance to the outer shell and moisture barrier of turnout gear.

63.    A June 2020 study of turnout gear by researchers at the University of Notre Dame analyzed 30 new and used turnout jackets and pants originally marketed, distributed and sold in 2008, 2014, and 2017, by six turnout gear makers, including Defendants MSA/Globe, Lion and Honeywell and found high levels of PFAS in turnout gear worn, used, or handled by firefighters, including FIRE MARSHAL HORTON.[5]

64.    When exposed to heat, PFAS chemicals in the turnouts off-gas, break down, and degrade into highly mobile and toxic particles and dust,[6] exposing firefighters to PFAS chemicals, particles and dust, including through skin contact/absorption, ingestion (e.g., hand-to-mouth contact) and/or inhalation.[7] Further firefighter exposure to these highly mobile and toxic materials occurs through normal workplace activities, because particles or dust from their turnouts spread to fire vehicles and fire stations, as well as firefighters' cars and homes.[8]

65.    Such workplace exposure to PFAS or PFAS-containing materials has been found to be toxic to humans. As far back as a July 31, 1980 internal memo, DuPont officials described measures that were needed to prevent workplace exposure to PFOA, which they knew could permeate all protective materials, and noted that PFOA's toxicity varied depending on the exposure pathway, acknowledging that ingestion was "slightly toxic," dermal contact was "slightly to moderately toxic"

---

[4]  *What Materials Go Into Making Turnout Gear?*, Globe MSA Safety Website, (last visited February 26, 2021), https://globe.msasafety.com/selecting-your-gear/materials.
[5] Graham Peaslee et al., *Another Pathway for Firefighter Exposure to Per- and Polyfluoroalkyl Substances: Firefighter Textiles*, Environmental Science & Technology Letters 2020, 7, 8, 594-599 (Ecotoxicology and Public Health) (June 23, 2020) (hereinafter, "the Notre Dame Turnout Study").
[6] A.S. Young et al., *Per- and Polyfluoroalkyl Substances (PFAS) and Total Fluorine in Fire Station Dust,* J. Expo. Sci. Environ. Epidemiology (2021), https://doi.org/10.1038/s41370-021-00288-7.
[7] *Id.*
[8] *Id.*

COMPLAINT

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

1    and inhalation was "highly toxic."[9] The memo concluded "continued exposure is not tolerable."[10]

2        66.    As alleged herein, FIRE MARSHAL HORTON wore turnouts in the ordinary course

3    of performing his duties, as the turnouts were intended to be used and in a foreseeable manner, which

4    exposed him to significant levels of PFAS for years.

5        67.    MR. HORTON did not know, and in the exercise of reasonable diligence could not

6    have known, that the turnouts he wore or used in the course of performing his duties contained PFAS

7    or PFAS-containing materials, and similarly did not know and could not have known that he routinely

8    suffered exposure to PFAS or PFAS-containing materials in the turnouts they wore or used in

9    performing their duties. The turnout gear MR. HORTON wore or used did not contain labelling

10   information saying that the gear contained PFAS, and similarly did not warn MR. HORTON of the

11   health risks associated with exposure to PFAS.

12       **(2) PFAS-Containing Class B Foam**

13       68.    Class B foam is one of the primary tools used by firefighters for fire suppression and

14   is particularly effective for extinguishing fires involving oil and/or chemicals common at

15   transportation accidents, aircraft accidents, chemical spills, and Hazmat incidents. Class B foam is

16   also used in structural or other types of non-chemical fires when water cannot penetrate deeply

17   enough to ensure that unseen fire is extinguished. The most common Class B foam is aqueous film-

18   forming foam ("AFFF"). AFFF and other Class B foams contain PFAS.

19       69.    Class B foam concentrate is typically sold in five-gallon containers. To use Class B

20   foam, a Class B foam concentrate must first be mixed with water. To mix the foam concentrate and

21   water in an engine that is not pre-plumbed, an eductor must be placed in the foam concentrate to draw

22   up the concentrate and mix it with water to create a thick, white, foamy substance.

23       70.    The process of mixing Class B foam, plumbing and preparing it, and cleaning the

24   equipment after foam use causes exposure to PFAS through skin contact, inhalation, or ingestion

25   (e.g., hand-to-mouth contact). The Class B foam containers used by MR. HORTON and the fire

26   departments to mix and prepare the Class B foam for use did not say that the foam contains PFAS,

27

28   _____

[9] Robert Bilott, *Exposure* (2019), pg. 174.
[10] *Id*. at pg. 175.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD, STE. 345
LOS ANGELES, CA 90049

1    and did not warn MR. HORTON of the serious health risks associated with exposure to PFAS.

2        71.    Class B foam is used in fire extinguishment in a manner typical of routine methods of

3    fire extinguishment—by being sprayed through a fire hose.

4        72.    The techniques used for "laying a blanket" of Class B foam in fire extinguishment

5    include: banking the foam off a wall or vertical surface to agitate the foam before it covers the fire;

6    or applying it to the ground surface where the fire is burning. In structure fires, it can also be necessary

7    to spray the ceilings, walls and floors. Reapplication of foam is often necessary because the foam

8    blanket will break down over time.

9        73.    These techniques are used routinely in firefighting training as well as in real-world

10   fire extinguishment, and result in firefighters being sprayed or entirely soaked with Class B foam,

11   walking in and through Class B foam (which can reach thigh- or even waist-high), or kneeling in

12   Class B foam during use – all as depicted in the exemplar photographs below. As a result, the

13   techniques cause exposure to PFAS through skin contact, inhalation, or ingestion (e.g., hand-to-

14   mouth contact).

15       74.    As alleged herein, MR. HORTON used Class B foam in the ordinary course of

16   performing his duties as foam was intended to be used and in a foreseeable manner which exposed

17   him to significant levels of PFAS.

18       75.    MR. HORTON did not know, and in the exercise of reasonable diligence, could not

19   have known that the Class B foam they used in the course of performing their duties contained PFAS

20   or PFAS-containing materials, and similarly did not know and could not have known that they

21   routinely suffered exposure to PFAS or PFAS-containing materials in the Class B foam they used in

22   performing their duties.

23       76.    MR. HORTON's exposures to PFAS or PFAS-containing materials resulted in him

24   getting cancer, suffering through his cancer treatment and ultimately dying due to complications from

25   cancer.

26   ///

27   ///

28   ///

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD, STE. 345
LOS ANGELES, CA 90049

19

**B. The Chemical Structure of PFAS Makes Them Harmful to Human Health**

77.    PFAS are known as "forever chemicals" because they are immune to degradation, bio-accumulate in individual organisms and humans, and increase in concentration up the food chain.[11] Indeed, scientists are unable to estimate an environmental half-life (i.e. the time it takes for 50% of the chemical to disappear) for PFAS.[12] Additionally, some PFAS chemicals (known as "precursors") degrade into different long-chain PFAS chemicals.[13]

78.    PFAS are nearly indestructible and are highly transportable.[14] PFAS exposure to humans can occur through inhalation, ingestion, or dermal contact.[15]

79.    PFAS chemicals include "older" long-chain PFAS like PFOA, PFOS, and PFNA that have seven or more carbon atoms, and "newer" short-chain PFAS, like PFBA, PFBS, PFHxA, and PFHxS. The PFAS chemical industry has repeatedly asserted that short-chain PFAS are safer and bio-degrade more easily than long-chain PFAS. However, short-chain PFAS are molecularly similar to long-chain PFAS, and recent scientific research shows that short-chain PFAS are in fact extremely persistent, highly mobile and transportable, almost impossible to remove from water, bio-accumulate in humans and the environment, and show similar toxicity as long-chain PFAS.[16] For example, short-chain PFBA (with only four carbon molecules) which was created by defendant 3M and reportedly has a shorter half-life than other PFAS, recently has been found to accumulate in the lungs and, in

---

[11] *Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS)*, National Institute of Environmental Health Sciences (last visited February 26, 2021), https://www.niehs.nih.gov/health/topics/agents/pfc/index.cfm.

[12] *Id.*

[13] *Id*. at fn. 8; Monica Amarelo, *Study: Almost All Fluorine Detected in Fire Stations' Dust Is From Unknown "Forever Chemicals,"* Environmental Working Group (February 5, 2021), https://www.ewg.org/release/study-almost-all-fire-stations-dust-unknown-forever-chemicals.

[14] *Toxicological Profile for Perfluoroalkyls*, *see* Relevance to Public Health, Agency for Toxic Substances & Disease Registry, (last visited February 26, 2021), https://www.atsdr.cdc.gov/toxprofiles/tp.asp?id=1117&tid=237.

[15] *Id*. at Potential for Human Exposure, pg. 535.

[16] Cheryl Hogue, *Short-chain and long-chain PFAS show similar toxicity, US National Toxicology Program says*, Chemical and Engineering News, (August 24, 2019), https://cen.acs.org/environment/persistent-pollutants/Short-chain-long-chain-PFAS/97/i33; David Andrews, *FDA Studies: 'Short-Chain' PFAS Chemicals More Toxic Than Previously Thought*, Environmental Working Group (March 9, 2020), https://tinyurl.com/y3lbq7by; Stephan Brendel et al., *Short-chain Perfluoroalkyl Acids: Environmental Concerns and A Regulatory Strategy Under REACH*, Environmental Sciences Europe, Vol. 30, 1 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5834591/; Tom Neltner, *The Elephant in the Room: Potential Biopersistence of Short-Chain PFAS*, Environmental Defense Fund, (February 20, 2019), http://blogs.edf.org/health/2019/02/20/potential-biopersistence-short-chain-pfas/.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

turn, increase the severity of COVID-19 in patients with elevated levels of PFBA,[17] among other health concerns. Short-chain PFAS also have lower technical performance and may therefore be used at higher quantities cancelling out any supposed benefits of lower bioaccumulation potential.[18]

80.    There is no safe, acceptable or "normal" level of PFAS in the human body. Further, the fact that PFOA, PFOS, PFHxS, PFHpA, and PFNA are often found together presents a substantial risk to human health. Defendants' have continuously deflected from the reality that there are thousands of PFAS in their products – including precursor PFAS which degrade into PFOA and PFOS.[19]

81.    PFAS exposure affects nearly every system in the body.[20] It has been associated with multiple and serious adverse health effects in humans including, but not limited to, cancer (in various parts of the body), tumors, liver damage, immune system and endocrine disorders, thyroid disease, ulcerative colitis, birth defects, decreased fertility, pregnancy-induced hypertension, accelerated changes in gene expression, and increases in oxidative stress which can contribute to DNA changes, tumor promotion, and other health conditions.[21] It has also been found to concentrate in human blood, bones and organs, and to reduce the effectiveness of certain vaccines, a significant concern in light of COVID-19.[22]

///

///

---

[17] *Exposure to Toxic Chemical Linked with Worse COVID-19 Outcomes*, The Harvard Gazette (Jan. 6, 2021), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-exposure-linked-with-worse-covid-19-outcomes/.

[18] Martin Scheringer et al., *Helsingør Statement on Poly- and Perfluorinated Alkyl Substances* (PFASs), Chemosphere (June 14, 2014), https://www.sciencedirect.com/science/article/pii/S004565351400608X.

[19] Technical Fact Sheet - Perfluorooctane Sulfonate (PFOS) and Perfluorooctanoic Acid (PFOA), United States Environmental Protection Agency, (Nov. 2017), https://www.epa.gov/sites/production/files/2017-12/documents/ffrrofactsheet_contaminants_pfos_pfoa_11-20-17_508_0.pdf.

[20] Kelly Lenox, *PFAS Senate Hearing, Birnbaum's Expert Scientific Testimony*, Environmental Factor, National Institute of Environmental Health Sciences (May 2019), https://factor.niehs.nih.gov/2019/5/feature/1-feature-pfas/index.htm.

[21] A. Koskela et al., *Perfluoroalkyl substances in human bone: concentrations in bones and effects on bone cell differentiation*, Scientific Reports, (July 28, 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5533791/pdf/41598_2017_Article_7359.pdf; *National Toxicology Program Technical Report on the Toxicology and Carcinogenesis Studies of Perfluorooctanoic Acid Administered in Feed to Sprague Dawley (Hsd: Sprague Dawley SD) Rats*, National Toxicology Program, (May 2020), https://ntp.niehs.nih.gov/ntp/htdocs/lt_rpts/tr598_508.pdf.

[22] *Id*. (Koskela study); Tasha Stolber, *PFAS Chemicals Harm the Immune System, Decrease Response to Vaccines, New EWG Review Finds*, Environmental Working Group (November 12, 2020), https://www.ewg.org/news-and-analysis/2020/11/pfas-chemicals-harm-immune-system-decrease-response-vaccines-new-ewg.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD, STE. 345
LOS ANGELES, CA 90049

**C. Defendants Knowingly Designed, Manufactured, Developed, Marketed, Distributed, Supplied and/or Sold Toxic PFAS and/or Products Containing PFAS**

82.     Defendants have each designed, manufactured, developed, marketed, distributed, supplied, sold or otherwise used PFAS chemicals in products, including in PFAS-containing turnout gear and Class B foam, throughout the United States and in California and within Los Angeles, Riverside and San Bernardino Counties in California.

83.     PFAS were first developed in the 1930s and 1940s. Soon after, 3M began manufacturing a PFAS material called perfluorooctanoic acid ("PFOA"), selling it to other companies, including DuPont.

84.     By the 1950s, PFAS were widely used in large-scale manufacturing. Prior to this, PFAS had never been detected in nor were present in human blood or bodies.

85.     In the 1960s, Class B foam containing PFAS entered the global market and became the primary firefighting foam all over the world with 3M as one of the largest manufacturers.

86.     In the 1970s, Defendants National Foam and Tyco began to manufacture, market and sell Class B foam containing PFAS, followed by Defendants Chemguard and Dynax in the 1990s, and Defendant Buckeye in the 2000s.

87.     Founded in 1918, Defendant MSA/Globe began manufacturing, marketing and selling turnout gear with DuPont's NOMEX® PFAS-containing flame resistant fabric in 1966. MSA/Globe (under the Globe name) continues to manufacture, market and sell turnout gear using PFAS-containing fabrics supplied by its partners, DuPont, Gore, Tencate, and PBI.[23]

88.     Defendant Lion began to manufacture, market and sell turnout gear in 1970. Since its founding, and continuing through to the present, Lion makes, markets and sells turnout gear using PFAS-containing fabrics, including Teflon® F-PPE-treated thermal lining material supplied by Defendants DuPont's NOMEX® PFAS-containing flame/water/oil-resistant fabric, and moisture

---

[23] *See Globe History*, Globe MSA Safety Website, (last visited February 26, 2021), https://globe.msasafety.com/history; *Turnout Gear Materials*, Globe MSA Safety Website, (last visited February 26, 2021), https://globe.msasafety.com/materials.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

1     barrier fabrics supplied by Defendant Gore.[24]

2         89.     Defendant Honeywell acquired Norcross Safety Products LLC in 2008, entering the

3 protective gear industry and becoming one of the leading manufacturers of turnouts. Honeywell

4 makes, markets and sells turnout gear using PFAS-containing fabrics, supplied by Defendants

5 DuPont, Gore, PBI and StedFast.

6        **D. Defendants Know Exposure to PFAS Causes Serious Health Impacts**

7         90.     Defendants, including specifically 3M and DuPont, have long known about the serious

8 and significant impacts to health caused by exposure to PFAS, having conducted study after study on

9 the exposure and health effects of PFAS on animals, and in some cases, even on their own employees.

10 The findings of these studies were discussed within the companies internally yet were never shared

11 with their employees, nor were they made public or shared with any regulatory agencies. Among the

12 findings:

13         a.     A 1950 3M study showed that PFAS could build up in the blood of mice
and that PFAS could bind to proteins in human blood suggesting that PFAS

14              would not only remain, but also persist and accumulate in the body of the

15              exposed individuals with each additional exposure.[25]

16         b.     In 1961, a DuPont toxicologist warned that PFAS chemicals enlarge rat and
rabbit livers.[26] A year later, these results were replicated in studies with

17              dogs.[27]

18         c.     In 1963, 3M's technical handbook classified PFAS as toxic and advised that

19              "due care should be exercised in handling these materials."[28]

20         d.     In 1970, a company that purchased 3M'sfirefighting foam had to abandon
a test of the product because all the fish died.[29]

21

22

23 ────────────────

24 [24] *See Our History*, Lion Website (last visited February 26, 2021), http://www.lionprotects.com/lion-history; *Firefighter Turnouts*, Lion Website (last visited February 26, 2021), https://www.lionprotects.com/firefighter-turnout-gear#.

25 [25] Timeline - *For 50 Years, Polluters Knew PFAS Chemicals Were Dangerous But Hid Risks From Public*, Environmental Working Group, (2019), https://static.ewg.org/reports/2019/pfa-timeline/3M-DuPont-Timeline_sm.pdf; *see also*, https://www.ewg.org/pfastimeline/.

26 [26] *Id.*

27 [27] Nathaniel Rich, *The Lawyer Who Became DuPont's Worst Nightmare*, New York Times (June 6, 2016),https://www.nytimes.com/2016/01/10/magazine/the-lawyer-who-became-duponts-worst-nightmare.html.

28 [28] *Id.* at fn. 28.
[29] *Id.*

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA  90049

e.  In the 1970s, DuPont discovered that there were high concentrations of PFOA in the blood samples of factory workers at DuPont's Washington Workssite.[30]

f.  By the end of the 1970s, studies performed by, at least 3M, indicated that PFAS materials were resistant to environmental degradation and would persist in the environment.[31]

g.  In 1981, 3M, which still supplied PFOA to DuPont and other corporations, found that ingestion of PFOA caused birth defects in rats. 3Mreported this information to DuPont. DuPont then tested the children of pregnant employees in their Teflon division and found that of seven births, two children had eye defects. Defendants reassigned the female employees, but did not inform the EPA or make this information public.[32]

h.  In 1988, a company that purchased PFAS firefighting foam complained to 3M because the product was not biodegradable as 3M represented.[33] Subsequently, a 3M employee wrote an internal memo that "3M should stop perpetrating the myth that these fluorochemical surfactants are biodegradable, but the company continued to sell them."[34]

i.  By at least the end of the 1980s, research performed by Defendants, including specifically, Defendants 3M and DuPont, manufacturing and/or using PFAS materials indicated that at least one such PFAS material, PFOA, caused testicular tumors in a chronic cancer study in rats, resulting in at least Defendant DuPont classifying such PFAS material internally as a confirmed animal carcinogen and possible human carcinogen.[35]

j.  In the 1990s, Defendant DuPont knew that PFOA caused cancerous testicular, pancreatic and liver tumors in lab animals. One study also suggested that PFOA exposure could cause possible DNA damage.[36] Another study of workers found a link between PFOA exposure and prostate cancer.[37]

k.  In response to the alarming and detrimental health impact, DuPont began to develop an alternative to PFOA and in 1993, an internal memo announced

---

[30] *Id.*

[31]  *PFCS: Global Contaminants: PFCs Last Forever*, Environmental Working Group, (April 3, 2003), https://www.ewg.org/research/pfcs-global-contaminants/pfcs-last-forever.

[32] *Id*. at fn. 28.

[33] *The Devil They Knew: PFAS Contamination and the Need for Corporate Accountability, Part II*, Transcript of Hearing Before the Subcommittee on Environment of the Committee on Oversight and Reform, House of Representatives (September 19, 2019), https://docs.house.gov/meetings/GO/GO28/20190910/109902/HHRG-116-GO28-Transcript-20190910.pdf.

[34] *Id.*

[35] *Id*. at fn. 28.

[36] *Id.*

[37] *Id.*

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD, STE. 345
LOS ANGELES, CA  90049

24

COMPLAINT

that "for the first time, we have a viable candidate" that appeared to be less toxic and showed less bioaccumulation.[38] DuPont decided against using this potentially safer alternative, however, because products manufactured with PFOA were worth $1 billion in annual profit.[39]

1. On June 30, 2000, 3M and DuPont met to share 3M's "pertinent data on PFOA". 3M informed DuPont that the half-life of PFOA was much longer than animal studies showed.[40]

91.    Additionally, approximately fifty years of studies by Defendants, including by 3M and DuPont, on human exposure to PFAS found unacceptable levels of toxicity and bio-accumulation, as well as a link to increased incidence of liver damage, various cancers, and birth defects in humans exposed to PFAS.[41] These studies also revealed that, once in the body, PFAS has a very long half-life and that it takes years before even one-half of the chemicals begins to be eliminated from the body—assuming, of course, the body experiences no additional PFAS chemical exposure.[42]

92.    In the face of these findings, and despite passage of the Toxic Substances Control Actin 1976, which requires companies that manufacture, process or distribute chemicals to immediately report to the Environmental Protection Agency ("EPA") information that "reasonably supports the conclusion" that a chemical presents a substantial risk to health or the environment, Defendants did not inform the EPA, their consumers, firefighters, including MR. HORTON, PLAINTIFFS, or the public about the health impacts resulting from exposure to PFAS.[43] Indeed, in at least some instances, Defendants' own attorneys advised the companies to conceal their damaging findings on PFAS, which they did for decades.[44]

93.    In 2000, 3M announced that it would cease manufacturing a specific PFAS chemical, PFOS, as well as Class B foam, on the same day the EPA announced that PFOA and PFOS, two chemicals in the PFAS family, had a "strong tendency to accumulate in human and animal tissues

---

[38] Id.

[39] Id.

[40]    Internal    DuPont    Memorandum,    DuPont    Haskell    Laboratory    Visit    (June    30,    2000), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1721.pdf.

[41] Id. at fn. 28.

[42] Id.

[43] Id.

[44] Id. at fn. 28.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

and could potentially pose a risk to human health and the environment over the long term."[45]

94.     However, 3M did not recall PFOS, its chemical feedstock, Class B foam that it had previously manufactured, sold, or distributed, or that was then stored at firehouses and being used by firefighters around the country. And, no other Defendant stopped manufacturing PFAS chemicals or products containing PFAS. Rather, Defendants continued to manufacture, develop, market, promote, distribute and sell PFAS chemicals and PFAS-containing products, including specifically PFAS-containing turnouts, and Class B foams and did so without any warning to firefighters or to the public concerning the fact that these turnouts and foams contained PFAS, or that they posed a serious health risk to human health. Defendants instead continued to claim their products were safe.

95.     By the 2000s, Defendants' own research of its employees revealed multiple adverse health effects among workers who had been exposed to PFAS, including increased cancer incidence, hormone changes, lipid changes, and thyroid and liver impacts.[46]

96.     In 2001, a class action lawsuit was filed in West Virginia against DuPont on behalf of people whose water had been contaminated by the nearby DuPont chemical plant where PFAS chemicals were manufactured.

97.     Defendants continued to manufacture, market, promote, distribute, and sell PFAS and PFAS-containing products, including turnouts and Class B foam, and continued to publicly claim that these products were safe. Defendants affirmatively suppressed independent research on PFAS, and instead commissioned research and white papers to support their claims that PFAS and PFAS-containing products were safe to use, engaging consultants to further this strategy and ensure that they would continue to profit from these toxic chemicals and products.

98.     As one consultant wrote in pitching its services to DuPont, it was critical that the PFAS industry develop an aggressive strategy to "[discourage] governmental agencies, the plaintiffs' bar and misguided environmental groups" and "[implement] a strategy to limit the effect of litigation and regulation on the revenue stream generated by PFOA." The strategy was further described by

---

[45] *EPA and 3M Announce Phase Out of PFOS*, Press Release, United States Environmental Protection Agency (May 16, 2000), https://archive.epa.gov/epapages/newsroom_archive/newsreleases/33aa946e6cb11f35852568e1005246b4.html.
[46] *Id.* at fn. 28.

consultant as follows:

> DUPONT MUST SHAPE THE DEBATE AT ALL LEVELS…. The outcome of this process will result in the preparation of a multifaceted plan to take control of the ongoing risk assessment by the EPA, looming regulatory challenges, likely litigation, and almost certain medical monitoring hurdles. The primary focus of this endeavor is to strive to create the climate and conditions that will obviate, or at the very least, minimize ongoing litigation and contemplated regulation relating to PFOA. **This would include facilitating the publication of papers and articles dispelling the alleged nexus between PFOA and teratogenicity as well as other claimed harm**. We would also lay the foundation for creating Daubert precedent to discourage additional lawsuits.[47]

99.    Class B foam manufacturers and distributors adopted a similarly aggressive industry campaign to evade government oversight or public attention of the risks posed by their products. At a March 2001 meeting of the National Fire Protection Association's Technical Meeting on Foam, which included Defendant Class B foam manufacturers Tyco, Chemguard and National Foam, a 3M representative informed attendees that 3M had discontinued its Class B foam business, citing concerns about the "proven pervasiveness, persistence and toxicity" of PFOS.[48] Attendees also were informed of evidence that telomer-based fluorosurfactants (used by every Class B foam manufacture except 3M) degrade to PFOA and, worse, exhibit an even greater degree of pervasiveness and toxicity than PFOA.

100.    On or about the same time, certain Defendants, including at least Tyco, DuPont, Dynax, Kidde, and Buckeye, founded and/or became members of the Fire Fighting Foam Coalition ("FFFC") – a non-profit organization of manufacturers, distributors and suppliers of Class B foam (specifically AFFF).[49] The FFFC's self-described role was to be "the environmental voice for users and manufacturers of AFFF" – one designed to ignore the health impacts of exposure to PFAS-containing Class B foams such as AFFF:

> Not too long ago, 3M had environmental concerns about a chemical in their product and decided to withdraw from the AFFF market. Even though no other manufacturers used the questionable chemical, the withdrawal of 3M

---

[47] Letter from P. Terrence Gaffney, Esq of The Weinberg Group to Jane Brooks, Vice President, Special Initiatives, DuPont de Nemours & Company, regarding PFOA (April 29, 2003).

[48] NFPA-11 Technical Committee Meeting Notes (National Fire Protection Association for Standards on Low-, Medium- and High-Expansion Foam) (March 14-15, 2001), https://assets.documentcloud.org/documents/4178280/NFPA-Schedule.pdf.

[49] Fire Fighting Foam Council Website (last visited February 26, 2021), https://www.fffc.org/.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD, STE. 345
LOS ANGELES, CA 90049

from AFFF production raised a red flag. As a direct result, a lot of half-truths and misinformation published by some well-meaning, but misinformed, groups began to surface. One organization went so far as to label our products as "hazardous waste" and as posing an "occupational health or environmental hazard." At the same time, the Federal government was focusing its attention on the industry and needed to identify an industry representative that could provide fact-based information and serve as a focal point for dialogue. We decided, therefore, to form the FFFC in order to educate, inform and help persuade regulatory and legislative decision-makers that firefighting foams are a value-added component to any firefighting capability.[50]

101.    Defendants also pivoted with a new industry strategy. Defendants continued to produce Class B foams containing PFAS and continued to publicly represent that PFAS and/or products containing PFAS were safe, while developing newer, "short-chain" PFAS alternatives.

102.    In 2005, the EPA fined DuPont $16.5 million for failing to submit decades of toxicity studies of PFOA (one PFAS chemical manufactured by the company).[51] In the face of and undeterred by the EPA's action, Defendant turnout manufacturers, such as MSA (Globe) and Lion, partnered with DuPont and with Defendant Gore to develop, manufacture, market, distribute and turnouts made with DuPont's and/or Gore's PFAS-based textile coatings (e.g., Nomex® and Gore® Protective Fabrics).[52]

103.    In 2006, the EPA "invited" eight PFOA manufacturers, including Defendants DuPont, 3M, Arkema, and Daikin to join in a "Global Stewardship Program" and phase out production of PFOA by 2015.[53]

104.    By this time, Defendants had begun to aggressively manufacture, market and/or distribute short-chain PFAS, such as Gen X, claiming that these alternative PFAS chemicals did not

---

[50] *Id*. at https://web.archive.org/web/20020811142253/http:/www.fffc.org/about.html (captured August 11, 2002).

[51] Michael Janofsky, *DuPont to Pay $16.5 Million for Unreported Risks*, New York Times (December 5, 2005), https://www.nytimes.com/2005/12/15/politics/dupont-to-pay-165-million-for-unreported-risks.html.

[52] *DuPont and LION Collaborate to Better Protect Firefighters and First Responders*, Press Release, DuPont and LION (January 30, 2013), https://www.prweb.com/releases/dupont_protection_tech/lion_turnout_gear/prweb10362363.htm; *Our Partners*, Globe Website (last visited February 26, 2021), https://globe.msasafety.com/our-partners; and *Firefighter & Emergency Response Protection*, DuPont Website (last visited February 26, 2021), https://www.dupont.com/personal-protection/firefighter-protection.html.

[53] *PFOA Stewardship Program*, United States Environmental Protection Agency (last visited February 26, 2021), https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/risk-management-and-polyfluoroalkyl-substances-pfas#tab-3.

pose significant health risks to humans or the environment. But, these claims, too, were false. Defendants knew that certain of these short-chain PFAS chemicals had been found in human blood, and that at least one of them produces the same types of cancerous tumors (testicular, liver, and pancreatic) in rats as had been found in long-chain PFAS studies.[54]

105.    In 2011, a C8 Science Panel convened as part of a settlement in the West Virginia DuPont water contamination case described above, began releasing its findings. The Panel had analyzed the blood serum of nearly 70,000 residents living in the water contamination area for two long-chain PFAS (PFOA and PFOS), and found significant negative human health effects (including, kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, high cholesterol and preeclampsia) associated with exposure to these PFAS chemicals in the area groundwater.

106.    In 2013, DuPont entered an agreement with the EPA and ceased production and use of PFOA – just one of thousands of PFAS chemicals the company makes, promotes and sells. Defendants, however, continued manufacturing short-chain PFAS materials, chemical feedstock, and products—all the while peddling them as safer, and as more easily bio-degraded than long-chain PFAS, despite evidence to the contrary.[55]

107.    In 2015, DuPont spun-off its PFAS chemicals business, as well two-thirds of its environmental liabilities and 90% of its active litigation, to Defendant Chemours. As part of the transaction, DuPont required Chemours to indemnify the "new" DuPont for all assigned environmental liabilities should a regulatory agency or plaintiff seek to hold the "new" DuPont accountable. As Chemours President Paul Kirsch testified before Congress: "DuPont designed the separation of Chemours to create a company where it could dump its liabilities to protect itself from environmental cleanup and related responsibilities."[56]

108.    In June 2018, the Agency for Toxic Substances and Disease Registry (ASTDR), a division of the Centers for Disease Control and Prevention at the US Department of Health and Human Services released an 852-page draft toxicology report analyzing scientific data about the most

---

[54]  Sharon Lerner, *New Teflon Toxin Causes Cancer in Lab Animals*, The Intercept (March 3, 2016), https://theintercept.com/2016/03/03/new-teflon-toxin-causes-cancer-in-lab-animals/.

[55] *Id*. at fn. 19, *see* Tom Neltner, http://blogs.edf.org/health/2019/02/20/potential-biopersistence-short-chain-pfas/.

[56] *Id*. at fn. 36.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

common PFAS chemical variants, finding that PFAS "are potentially more hazardous than previously known, are particularly concerning because of these compounds' persistence in the environment and widespread prevalence—PFAS are extremely slow to biodegrade."[57]

109.    In September 2019, DuPont chief operations and engineering officer Daryl Roberts testified before Congress that the "new DuPont" (to be distinguished from the "old DuPont" which manufactured and sold PFAS for decades before being spun-off to Chemours) no longer uses or manufactures PFAS and is no longer responsible for obligations and harms resulting from over 65 years of producing PFAS.[58] Roberts further testified that he knew nothing about "old DuPont's" efforts to suppress research on PFAS' toxicity as testified to by one of DuPont's former scientists only a few days earlier.[59] Finally, he stated that any liabilities from "old DuPont's" PFAS operations were now Chemours' problem because DuPont is essentially a completely new company with no past – only a bright future of doing good in the world.[60]

**E. Defendants Failed to Warn Firefighters, Including FIRE MARSHAL HORTON, of the Dangers of Exposure to PFAS and Falsely Represented That Their PFAS Products Were Safe**

110.    As alleged above, Defendants knew that PFAS are persistent, toxic, and bio-accumulating with a very long half-life. They knew that exposure to PFAS can cause serious and life-threatening diseases, including cancer.

111.    Yet, Defendants *did not warn* firefighters, including FIRE MARSHAL HORTON, that PFAS and Defendants' PFAS-containing products, including turnouts and Class B foams used by firefighters, including FIRE MARSHAL HORTON, contained PFAS, or that exposure to PFAS in the normal and intended use of such products, causes serious bodily harm and illnesses, including cancer.

---

[57] *A Toxic Threat: Government Must Act Now on PFAS Contamination at Military Bases*, Center for Science and Democracy (September 2018), https://www.ucsusa.org/sites/default/files/attach/2018/09/a-toxic-threat-pfs-military-fact-sheet-ucs-2018.pdf.
[58] *Id*. at fn. 36.
[59] *Id.*
[60] *Id.*

112.    Instead, Defendants falsely represented that PFAS and PFAS-containing products, including turnouts and Class B foams, are safe and not harmful to humans or the environment.

113.    Such assertions fly in the face of science and a global movement toward eliminating this class of chemicals from consumer products. In recent years, for example, Congress passed legislation to address PFAS in turnouts and foam,[61] and numerous states have severely restricted and/or banned PFAS-containing firefighting foam with California and Colorado also banning PFAS-containing turnouts as of 2022.[62] The U.S. Food and Drug Administration similarly has called for phasing out of short-chain PFAS that contain 6:2 fluorotelomer alcohol (6:2 FTOH).[63] And private companies like Home Depot, Lowes and Staples recently have begun to discontinue selling products containing any PFAS, as have several outdoor, durable clothing companies (e.g. Columbia and Marmot), clothing retailers (e.g. H&M, Levi Strauss & Co), shoe companies (e.g. Adidas and New Balance), car seat manufacturers (e.g. Britax and Graco), furniture companies (e.g. IKEA), personal care companies (e.g. Johnson & Johnson and Oral-B), and textile manufacturing companies.[64]

**(1) Defendants Provide No Safety Warnings on Product Labels**

114.    PLAINTIFFS allege that the packaging on the PFAS-containing Class B foam containers used for mixing Class B foam with water, pumping the mixture into engines, and for spraying and laying foam blankets for fire suppression or fire suppression training, contained no

---

[61] Ryan Woodward, *Congress Passes Legislation to Address PFAS Chemicals Impacting Firefighters,* Fire Rescue 1, (December 17, 2020), https://www.firerescue1.com/legislation-funding/articles/congress-passes-legislation-to-address-pfas-chemicals-impacting-firefighters-Sp8MFif5dAbD4ZrI/.

[62] Andrew Wallender, *Toxic Firefighting Foam With PFAS Scrutinized by Multiple States*, Bloomberg Law (June 18, 2020),    https://news.bloomberglaw.com/pfas-project/toxic-firefighting-foam-with-pfas-scrutinized-by-multiple-states; Cheryl Hogue, *California Bans PFAS Firefighting Foams*, Chemical & Engineering News (October 1, 2020), https://cen.acs.org/environment/persistent-pollutants/California-bans-PFAS-firefighting-foams/98/i38#:~:text=California%20is%20halting%20the%20sale,US%20market%20to%20do%20so; Marianne Goodland, *While Dozens of Bills are Getting Axed, A Bill on Firefighting Chemicals Sails On*, Colorado Politics (May 28, 2020), https://www.coloradopolitics.com/legislature/while-dozens-of-bills-are-getting-axed-a-bill-on-firefighting-chemicals-sails-on/article_1b1e05f2-a11e-11ea-a270-230a36e06594.html; *Legislature Takes Strongest Stand Yet to Phase out PFAS in Firefighting Foam*, Washington State Council of Fire Fighters (March 5, 2020), https://www.wscff.org/legislature-takes-strongest-stand-yet-to-phase-out-pfas-in-firefighting-foam/.

[63] *FDA Announces the Voluntary Phase-Out by Industry of Certain PFAS Used in Food Packaging*, U.S. Food and Drug Administration, July 31, 2020, https://www.fda.gov/food/cfsan-constituent-updates/fda-announces-voluntary-phase-out-industry-certain-pfas-used-food-packaging.

[64] Muhannad Malas, *Home Depot, Lowe's and Staples Take Action to Protect Their Customers from PFAS and Other Harmful Toxics Lurking in Carpets and Office Supplies*, Environmental Defence (November 5, 2019), https://environmentaldefence.ca/2019/11/05/home-depot-lowes-staples-protect-customers-toxics/; *PFAS-Free Products*, PFAS Central, (last visited February 15, 2021), https://pfascentral.org/pfas-free-products/.

31

warning that the Class B foam contained PFAS. Nor did it inform persons handling or using the foam as it was intended to be handled that such use can result in exposure to PFAS and serious bodily harm.

115.   The labels on the containers for Class B foam warn only of possible skin or eye irritation, and suggest rinsing areas of contact with water. They contain **no information** about the Class B foam containing PFAS or PFAS-containing materials, and provide **no warning whatsoever** of the human health risks and serious health conditions associated with PFAS exposure resulting from the normal and intended use of Class B foam in fire suppression or fire suppression training.

116.   PLAINTIFFS further allege that turnouts containing PFAS or PFAS materials sold or distributed by Defendants in California, and used by firefighters, including FIRE MARSHAL HORTON, in training, emergency incidents, or in fire suppression during their firefighting careers, also contained no warning that the turnouts contain PFAS or PFAS materials. Nor did these labels inform persons handling, wearing, or using the turnouts as they were intended to be handled, worn or used can result in exposure to PFAS and serious bodily harm.

117.   The labels for the turnouts made no mention of PFAS, did not advise that the turnouts contain PFAS or PFAS materials, and contained no warning that handling, wearing, or using the turnouts as they were intended to be handled, worn or used can result in exposure to PFAS and serious bodily harm. Further, while the labels provide washing instructions, the instructions do not advise that turnouts should be washed in a commercial extractor to prevent cross-contamination and PFAS-exposure to family members who handle or wash the turnouts with other garments in home washing machines.

**(2) Defendants' MSDS Sheets Do Not Warn About PFAS or PFAS Exposure**

118.   A Material Safety Data Sheet (or "MSDS") is a document that Occupational Safety and Health Administration (OSHA) requires companies to provide to end users for products that contain substances or chemicals that are classified as hazardous or dangerous. Access to such information is necessary for firefighters, including FIRE MARSHAL HORTON, to provide a safe and effective response in emergency situations.

119.   The MSDS provided with Defendants' Class B foams did not – and to this day do not – state that these foams contain PFAS or PFAS-containing materials; that PFAS is persistent,

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

toxic and bio-accumulating; or that PFAS exposure causes serious bodily harm. To the contrary, the MSDS falsely stated that the Class B foams and/or their contents were not known carcinogens and did not cause birth defects.

120.    Even as recently as November 2020, the MSDS did not reflect the known serious health risks and hazards associated with exposure to PFAS in Class B foams. For example, a MSDS updated on November 20, 2020, by Defendant National Foam for AFFF stated the product was not carcinogenic or toxic - contrary to decades of science.[65]

**(3) Defendants' Misrepresentations About PFAS Continue to this Day**

121.    Despite their decades of knowledge about PFAS and its dangers, Defendants continue to make false claims, continue to misrepresent the safety of PFAS, and continue to minimize and fail to warn about the hazards of exposure to PFAS, or turnouts and Class B foams made with or containing PFAS.

122.    Defendants' misinformation campaign is long-standing, and continues to this day. Some pertinent examples include:

   a.  2017 – Defendant Lion's President, Stephen Schwartz, wrote a letter to the editor of the Columbus Dispatch, expressing outrage at the assertion in a government filing that firefighters may have been exposed to PFAS through turnout gear. Schwartz called this assertion false, stating that Lion's turn-out gear is not treated or made with PFOS or PFOA:. "PFOAs and PFOSs have never been components of LION's turn-out gear, either as a coating or as a textile." He acknowledged that turn-out gear is treated with PTFE to provide a durable water repellant, and that the textile industry in the past had used PFOA as a processing aid to manufacture PTFE moisture barrier films and repellants. "It is possible that trace amounts may have been present as a residue when the films and finishes were incorporated into LION's turn-out gear. *However, based on all available scientific data, such nominal trace amounts, if they existed at all, would not have posed any health risk to firefighters. There is absolutely no connection at all between PFOS and firefighter turnout gear.*" (Emphasis added).[66]

   b.  2018 – The National Fire Protection Association (which maintains

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA  90049

---

[65] National Foam Safety Data Sheet for Centurion (TMC6) 6% Aqueous Film Forming Foam Concentrate (AFFF) (November 20, 2020), https://nationalfoam.com/wp-content/uploads/sites/4/NMS340-Centurion-6-AFFF-Concentrate_11302020.pdf.

[66] Letter from LION president Stephen A. Schwartz to Ala D. Miller, Editor, The Columbus Dispatch (October 30, 2017), http://files.constantcontact.com/bf8abd7a001/01f5d727-d72e-42dc-971b-caa9c2855800.pdf.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD, STE. 345
LOS ANGELES, CA 90049

committees on foams and turnouts that are comprised, in part, of certain Defendants) issued a publication listing 11 ways to minimize risk of occupational cancer – the suggestions centered on wearing turnouts for protection resulting from combustion or spills, and cleaning turnouts after exposure to chemicals. There was not a single mention of avoiding contact with foam and/or the risks of wearing turnouts containing PFAS or PFAS-containing materials.[67]

c.   2019 – Defendant 3M Vice President, Denise Rutherford, testified before Congress that she *absolutely agreed with the statement that "the weight of current scientific evidence does not show that PFOS or PFOA cause adverse health effects in humans at current rates of exposure*." (emphasis added)[68]

d.   2019 - The Fire Fighting Foam Council (of which many Defendants have been members since its inception in 2001) wrote in their newsletter that: "Short-chain (C6) fluorosurfactants do not contain or breakdown in the environment to PFOS or PFOA and are currently considered lower in toxicity and have significantly reduced bio-accumulative potential than long-chain PFAS."[69]

e.   2020 - FluorCouncil – the lobbying arm of the PFAS industry – maintains that PFAS fluorotelomers that are in Class B foam and turnouts do not cause cancer, disrupt endocrine activity, negatively affect human development or reproductive systems, do not build up in the human body, and do not become concentrated in the bodies of living organisms.[70]

f.   2020 – The Fire Fighting Foam Council website states: "The short-chain (C6) fluorosurfactants that have been the predominant fluorochemicals used in fluorotelomer-based AFFF for the last 25 years are low in toxicity and considered to be bio-accumulative based on current regulatory criteria."[71]

g.   2020 – The Fire Fighting Foam Council's Best Practice Guidance for Use of Class B Foam - which was published in May 2016 and has not been updated to reflect the latest research - focuses entirely on eliminating and containing foam to minimize impact on the

---

[67] *11 Best Practices for Preventing Firefighter Cancer Outlined in New Report Put Out by VCOS and NVFC*, National Fire Protection Association Xchange (August 16, 2018), https://community.nfpa.org/community/nfpa-today/blog/2018/08/16/11-best-practices-for-preventing-firefighter-cancer-outlined-in-new-report-put-out-by-vcos-and-nvfc.

[68] Gabe Schneider, *3M Grilled over PFAS Chemicals at Congressional Hearing*, MinnPost (September 11, 2019), https://www.minnpost.com/national/2019/09/3m-grilled-over-pfas-chemicals-at-congressional-hearing/.

[69] *AFFF Update Newsletter*, Fire Fighting Foam Council (April 2019), https://tinyurl.com/y57c5jwx.

[70] *An Important Update About FluoroCouncil*, FluoroCouncil, Global Industry Council for Fluoro Technology (last visited September 7, 2020), https://fluorocouncil.com/important-update-about-fluorocouncil/.

[71] *Fact Sheet on AFFF Fire Fighting Agents*, Fire Fighting Foam Council (2017), https://tinyurl.com/yyxscyas.

environment. It makes no mention of how to minimize the impact on firefighters who routinely handle, prepare, spray, or use Class B foam during training or in firefighting.[72]

123.    As frequent sponsors and advertisers in fire service publications, Defendants have been so influential in the industry that fire service leadership have echoed these narratives.

124.    For example, in 2017, the International Association of Fire Fighters ("IAFF"), which represents more than 324,000 full-time professional firefighters, issued a statement that both mischaracterized and purported to state that the risks associated with exposure to PFAS and PFAS chemicals and materials in turnouts and Class B foams was minimal to non-existent. The statement even encouraged firefighters to continue to wear turnouts and use legacy Class B foams, creating a false sense that these PFAS-containing turnouts and foams were safe. The statement reads, in relevant part:

> Importantly, PFOA use has been almost completely phased out in the US….Fire fighters may have additional PFOA exposure sources such as older Class B firefighting foams. If PFOA is a combustion product of PFOA-containing consumer products made prior to phasing out use of this chemical, fire fighters will be exposed in fire suppression activities. However, the data are too limited at present to determine this. PFOA is unlikely to be a component in recently US manufactured turnout gear. However, if PFOA is a combustion product, it may be present as a contaminant on turnout gear. PFOA may also be present as a manufactured component of legacy turnout gear….The exposure contribution from any such PFOA content is likely to be minimal since volatilization from the manufactured product would be required….**At this time, IAFF does not recommend that legacy turnout gear be replaced outside of its lifecycle. Fire fighters wishing to minimize PFOA exposure should continue to wear their PPE…and regularly decontaminate their turnout gear**. IAFF will continue to monitor developments and update this fact sheet should new information become available.[73]

125.    The IAFF maintained this position until January 2021 when IAFF members demanded that the IAFF leadership hold turnout and Class B foam manufacturers accountable.[74]

---

[72] *Best Practice Guidance for Use of Class B Firefighting Foams*, Fire Fighting Foam Council (May 2016), https://tinyurl.com/2kzdsed9.

[73] Need to copy over the footnote, if we're going to keep this claim.

[74] Need to copy over the footnote, if we're going to keep this claim.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

126.    Because of these and other false claims and misrepresentations on the part of Defendants, firefighters, including FIRE MARSHAL HORTON, did not know and, in the exercise of reasonable diligence, could not have known that the turnouts and Class B foams they used contained PFAS or PFAS-containing materials, and caused firefighters, including FIRE MARSHAL HORTON, to be exposed to PFAS and/or PFAS-containing materials, causing them to suffer cancers and other serious illnesses as a result of such exposure.

**F. New Research Indicates That Firefighters are at Significant Risk of Harm From Exposure to PFAS in Turnouts and Class B Foams — But Defendants Continue to Discount or Deny These Risks**

127.    While historical research (and litigation) has centered on environmental impacts and environmental exposures associated with PFAS and PFAS-containing products, recent studies have focused specifically on the serious health impacts to firefighters stemming from their occupational exposure to turnouts and Class B foams containing PFAS.

128.    In October 2019, for example, an expert panel of the International Pollutants Elimination Network (IPEN), an international non-profit organization comprised of over 600 public interest non-governmental organizations dedicated to improving global chemical waste policies, published a scientific paper that, in the words of its authors, "presents unequivocal evidence from recent studies that firefighters" using Class B foams (primarily AFFF) "have unexpectedly elevated blood levels" of PFAS, including, specifically, PFHxS and PFOS, with PFHxS (a short-chain, C6 PFAS) being "potentially of greater concern than PFOS given its much longer elimination half-life in humans."[75]

129.    The paper explains that "[f]irefighters can be significantly exposed to PFHxS and other PFAS from firefighting foam via various occupational mechanisms including direct exposure during use as well as exposure from contaminated personal protective equipment (PPE), handling of contaminated equipment, managing PFAS foam wastes, occupation of

---

[75] *Perfluorohexane Sulfonate (PFHxS) – Socio-Economic Impact, Exposure and the Precautionary Principle Report*, IPEN Expert Panel (October 2019), https://ipen.org/sites/default/files/documents/pfhxs_socio-economic_impact_final_oct.2019.pdf.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD, STE. 345
LOS ANGELES, CA 90049

contaminated fire stations and consumption of contaminated local water and produce. Cross-contamination and legacy PFAS residues from inadequately decontaminated appliances after transitioning to fluorine-free foam can remain a long-term problem."[76]

130.    The panel concluded that "[o]ngoing exposure to PFHxS, PFOS and other PFAS amongst firefighters remains a major occupational health issue," noting that "[b]io-accumulation and very slow bio-elimination may be very significant influencing factors in PFHxS exposure" in firefighters.[77] "Of greater concern," the panel observed, "is that firefighter blood levels for PFOS and PFHxS are many times higher than the median values for the general…population."[78]

131.    In June 2020, scientists at the University of Notre Dame published a ground-breaking study on PFAS in turnout gear, and the exposure risks posed to firefighters that wear, wore, or handle such gear ("Notre Dame Turnout Study"). The Notre Dame Turnout Study analyzed over 30 sets of used and unused (still in their original packaging) turnout gear made by six U.S. manufacturers, including Defendants MSA/Globe, Lion and Honeywell, over several production years, as listed below:[79]

| PPE gear manufacturers sampled: | # samples |
| --- | --- |
| Globe Manufacturing (Pittsfield MA), | 11 |
| Lion Group (Dayton OH), | 12 |
| Honeywell First Responder (Dayton, OH), | 2 |
| Lakeland Fire (Decatur, AL) | 2 |
| Quest Fire Apparel (Saratoga Springs, NY) | 1 |
| Quaker Safety (Quakertown, PA) | 2 |

The type and number of turnout gear samples used in this study.

132.    The Notre Dame Turnout Study noted that these manufacturers' turnout gear (or personal protective equipment-PPE, as it is described in the study) are manufactured "from textiles that are made from fluoropolymers (one form of PFAS) or extensively treated by PFAS in the form of side-chain fluoropolymers."[80] According to the researchers, "[t]hese PFAS include fluoropolymer materials such as PTFE used as a moisture barrier in the inner layers of turnout

---

[76] *Id.* at p. 25.
[77] *Id.*
[78] *Id.*
[79] *Id.* at fn. 7.
[80] *Id.* at p. A.

gear."[81] The study found significant levels of PFAS chemicals – including PFOA, PFOS, PFBA, PFPeA, PFHxA, PFHpA, PFNA, PFDA, PFUnA, PFDoA, PFTrDA, PFToDA, PFBS, PFOSA, N-EtFOSA, MeFOSAA, N-MeFOSE, N-EtFOSE and 6:20FTS – in both new and used turnout gear, and across layers, portions, and materials in the turnout gear, including in material layers that are not intentionally treated with PFAS by the manufacturer, thereby providing "the first evidence that suggests PFAS appear to migrate from the highly fluorinated layers and collect in the untreated layer of clothing worn against the skin."[82]

133.    These findings suggest that, as the garments are worn, PFAS from the outer shell and the moisture barrier can migrate from the turnouts and contaminate both the firefighter, their apparatus and workplace with PFAS. The analysis also indicated that fluoropolymers from the outer layer decompose into other PFAS, including PFOA.

**Environmental Science & Technology Letters**    pubs.acs.org/journal/estlcu    Letter

**Table 2. Quantities of Target PFAS (in ppb) Found in US Turnout Gear by LC−MS/MS Analysis**

| values in ppb | jacket 2008 unused | | | pants 2014 used | | | jacket 2008 used | jacket 2017 unused |
|---|---|---|---|---|---|---|---|---|
| | thermal liner | moisture barrier | outer shell | thermal liner | moisture barrier | outer shell | moisture barrier | moisture barrier |
| PFBA | <MDL | 12.8 | 10.6 | 139 | 615 | 21.5 | 20.5 | 991 |
| PFPeA | <MDL | 12.6 | 17.8 | 228 | 104 | 164 | 18.1 | 2.49 |
| PFHxA | <MDL | 30.5 | 36.9 | 199 | 28.6 | 10.9 | 35.8 | 36.9 |
| PFHpA | <MDL | 12.4 | 25.4 | 105 | 5.82 | 2.23 | 14.3 | 25.4 |
| PFOA | 78 | 46 | 182 | 850 | 71 | 97 | 37 | <MDL |
| PFNA | 2.63 | <MDL | 8.2 | 25.3 | 1.95 | <MDL | 2.76 | <MDL |
| PFDA | 2.98 | 6.51 | 5.51 | 133 | <MDL | <MDL | 23.7 | <MDL |
| PFUnA | <MDL | <MDL | <MDL | 7.96 | <MDL | <MDL | 2.51 | <MDL |
| PFDoA | <MDL | 5.01 | <MDL | 68.6 | <MDL | <MDL | 25.9 | <MDL |
| PFBS | 283 | 140 | 142 | 53 400 | 47 900 | 1050 | 230 | 90 400 |
| PFOS | <MDL | <MDL | <MDL | 7 | <MDL | <MDL | 2 | <MDL |
| 6:2 FTS | <MDL | <MDL | <MDL | 25.9 | 12.9 | <MDL | <MDL | <MDL |
| 8:2 FTS | <MDL | <MDL | <MDL | 11.1 | <MDL | <MDL | <MDL | <MDL |

134.    "Startlingly," researchers reported, "garment to hand transfer of total fluorine in the ppm range was also observed when researchers simply manipulated the textiles in [the] laboratory."[83] The accumulation of PFAS on researchers' hands strongly suggests that transference of ppm levels of PFAS can occur merely by handling the turnouts and that PFAS

---

[81] *Id.*

[82] *Id.* at p. C.

[83] *Id.*

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

exposure pathways include inhalation, ingestion and/or absorption (through dermal contact) – all of which DuPont internally acknowledged as being toxic in 1980. Such exposure pathways are a concern not only for firefighters that rely on turnouts to protect them from heat, fire, water and chemical hazards in the field, but to family members who may be exposed to the PFAS in turnouts as the result of home washing or storage. Lead researcher Graham Peaslee commented that turnouts are "the most highly fluorinated textiles I've ever seen"[84] and that the level of PFAS in the turnout gear means that firefighters are "swimming in a sea of [PFAS]. Those numbers for scientists are scarily high..."[85]

135.    Despite these findings, Defendants have been quick to mischaracterize, dismiss or downplay the significance of the Notre Dame Turnout Study. Defendant MSA/Globe, when contacted about the study and asked whether Globe planned to study this issue and find an alternative to PFAS for turnouts, merely responded thusly: "[P]rotecting (firefighters) is Globe's business; every piece of our turnout gear meets or exceeds applicable industry standards."[86]

136.    Defendant Lion's responses have been similar, and have also dismissed or minimized the significance of the Notre Dame Turnout Study's findings. Lion issued a Customer Safety Alert for PFOA and Turnout Gear stating: "Your LION turnout gear continues to be safe and ready for action especially when properly maintained. It is extremely important that firefighters continue to wear and properly care for their gear to stay safe on the job."[87]

137.    The Customer Safety Alert goes on to stress that Lion does not use PFOA or PFOS (two long-chain PFAS chemicals) in its turnouts.[88] It does not, however, address that the maker's turnouts in fact contain other PFAS chemicals, nor warn firefighters or the public about health

---

[84] Raleigh McElvery, *Protective Gear Could Expose Firefighters to PFAS*, Chemical and Engineering News (July 1, 2020), https://cen.acs.org/environment/persistent-pollutants/Protective-gear-expose-firefighters-PFAS/98/i26?fbclid=IwAR3ktyIcasjnxHiv3RNDRJldZmunQleAEoS3Av225uOscj2hFbffVcO3-Go.

[85] Andrew Wallender, *Firefighters Face New Possible Risk From Toxic PFAS: Their Gear*, Bloomberg Law (June 23, 2020), https://news.bloomberglaw.com/pfas-project/firefighters-face-new-possible-risk-from-toxic-pfas-their-gear.

[86] Blair Miller, *Local Firefighters Concerned About Potentially Dangerous Chemicals on Gear*, Boston 25 News (February 26, 2019), https://www.boston25news.com/news/local-firefighters-facing-concerns-over-potentially-dangerous-chemicals-on-gear/92523612/.

[87] LION Customer Safety Alert – PFOA and Turnout Gear (April 24, 2019), https://cdn2.hubspot.net/hubfs/3475623/LION_PFOA_factsheet_042419.pdf.

[88] *Id.*

39
COMPLAINT

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD, STE. 345
LOS ANGELES, CA 90049

1    harms associated with exposure to these toxic, bio-accumulating chemicals.

2        138.    Defendant Lion's paid consultant, Dr. Paul Chrostowski, also has taken aim at the

3    Notre Dame Turnout Study and its findings. Refuting a *Fire Rescue* magazine article about the

4    study,[89] Chrostowski repeated Lion's website statement that "PFOA was never part of the gear

5    itself and frequent independent testing has found only trace amounts of it in any of the gear –

6    not nearly enough to cause concern, and in amounts similar to consumer products."[90]

7    Chrostowski went on to say "[t]he fact is that one may find trace amounts of 'short-chain' PFAS

8    such as PFBS and PFHxA in firefighting textiles, but the scientific research shows that these

9    materials are far less toxic than even PFOA and at the tiny trace levels the risk are extremely

10   low based on numerous credible published scientific research papers."[91] Finally, Chrostowski

11   falsely stated that the link between PFAS exposure and cancer is "extremely weak."[92]

12       139.    And yet, Lion concedes that dermal absorption is a pathway of exposure to cancer-

13   causing chemicals for firefighters. In a *Not in Our House* cancer awareness fact sheet that

14   currently appears on the company's website, Lion warns firefighters: "For every 5 degree

15   increase in temperature, skin becomes 400% more absorbent. The hotter you are, the more

16   carcinogens your skin absorbs.[93] This statistic is alarming given that the core body temperature

17   of firefighters routinely increases during firefighting activities while wearing turnouts which

18   contain known carcinogens.[94]

19   ///

20   ///

21

22   [89] Larissa Conroy, *What If I Told You That Your Bunker Gear Was Causing Cancer?*, Fire Rescue (May 28, 2020), https://www.firefighternation.com/firerescue/what-if-i-told-you-that-your-bunker-gear-was-causing-cancer/#gref.

23   [90] Paul Chrostowski, Ph.D., QEP, *Research and Independent Testing Shows Firefighters' Turnout Gear Remains Safe Despite Claims*, Fire Rescue (June 3, 2020). https://firerescuemagazine.firefighternation.com/2020/06/03/research-and-

24   independent-testing-shows-firefighters-turnout-gear-remains-safe-despite-claims/ - gref.

     [91] *Id.*

25   [92] *Id.*

26   [93] LION website, https://cdn2.hubspot.net/hubfs/3475623/NOT IN OUR HOUSE Tip Sheet_Infographic (02-02-19).pdf (last visited February 26, 2021).

27   [94] Nancy Espinoza, *Can We Stand the Heat?*, Journal of Emergency Medical Services, (April 30, 2008), https://www.jems.com/operations/can-we-stand-heat-study-reveal/; Gavin P. Horn, et al., *Thermal Response to*

28   *Firefighting Activities in Residential Structure Fires: Impact of Job Assignment and Suppression Tacti*c, Ergonomics (July 31, 2017), https://tinyurl.com/4j2mz7f7.

140.    The IAFF holds a yearly cancer summit and yet has done little to address the PFAS in turnouts.[95] Defendants, including at least DuPont, Gore, Lion and MSA (Globe), have been regular sponsors of the IAFF Cancer Summit.

141.    At this event, as well as in firefighter cancer-related publications, programs and events, Defendants repeatedly used the summit as an opportunity to push the narrative that incidence of cancer among firefighters is attributable either to other chemicals encountered in the line of duty, or firefighters' failure to wash their turnouts after every call. Not once have the turnout Defendants admitted that the PFAS materials in their products has been found to be carcinogenic, and that the very equipment that should be protecting firefighters are causing the most harm. Further, Lion's recently launched "Not in Our House" cancer awareness program is sadly ironic in that it encourages *firefighters to make a pledge* ("I will make every effort to protect myself and my team by doing my part to take precautions that will minimize the risk of exposure to carcinogens that may lead to cancer…") while refusing to take any responsibility for continually exposing firefighters to carcinogens in their protective gear.[96]

142.    Firefighters, including FIRE MARSHAL HORTON, deserved and deserve better. They are the first to respond to emergencies faced by their community, and never hesitate to help. Whether delivering a baby, responding to a fire, medical emergency, accident, mass shooting, terrorist attack, natural disaster, or teaching kids about fire safety, firefighters always put the community first. When a child is drowning in a pool or a family is caught in a burning

---

[95] As alleged above, in para. 147, fn. 77, IAFF has only recently begun to take action related to PFAS exposure due to pressure from its firefighter members. At the IAFF Annual Meeting in January 2021, two groundbreaking PFAS-related firefighter safety resolutions passed with the support of 99% of the membership. The resolutions require IAFF to: (1) sponsor independent testing of turnouts for PFAS and PFAS-related hazards, (2) oppose the use of PFAS and PFAS-containing materials in turnouts, (3) require manufacturers to cease using PFAS in their firefighting products (4) identify which manufacturers will not cease using PFAS, (5) issue an advisory to fire departments to stop sending used or old turnouts to communities that are not able to buy new gear and instead provide grants to purchase new gear, and (6) cease accepting financial sponsorships from any PFAS/chemical-related companies unless it is to purchase PFAS-free turnout gear. Andrew Wallender, *PFAS Resolutions Overwhelmingly Approved by Firefighters' Union*, Bloomberg Law (February 1, 2021), https://news.bloomberglaw.com/daily-labor-report/pfas-resolutions-overwhelmingly-approved-by-firefighters-union; San Francisco Firefighters Cancer Prevention Foundation, (last visited February 26, 2021), https://www.sffcpf.org/resolutions-to-protect-members-from-toxic-substances-in-ppe/.

[96] Rachel Zoch, *Take A Pledge To Stop Cancer At the Door*, Fire Rescue 1 (January 28, 2019), https://www.firerescue1.com/fire-products/personal-protective-equipment-ppe/articles/take-a-pledge-to-stop-cancer-at-the-door-e8bn7uAbtIXWdQau/.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

house, they do not stop to calculate whether they will benefit by doing the right thing. They are true public servants. They step in and do what is needed when it is needed the most. Their health, safety and well-being must be of the highest priority.

143.     Based on all of the foregoing, PLAINTIFFS, bring this action for damages and for other appropriate relief sufficient to compensate them for the harm Defendants' PFAS chemicals and PFAS-containing products have caused.

## EQUITABLE TOLLING OF APPLICABLE STATUE OF LIMITATIONS

144.     PLAINTIFFS incorporate by reference all prior paragraphs of this complaint as though fully set forth herein.

### A. Fraudulent Concealment

145.     Defendants have known or should have known about the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS and PFAS-containing materials since at least the 1960s and as late as the early 1990s when study after study showed not only unacceptable levels of toxicity and bioaccumulation in human blood, but links to increased incidence of liver damage, various cancers and birth defects.

146.     Through no fault or lack of diligence, firefighters, including FIRE MARSHAL HORTON, and PLAINTIFFS were deceived regarding the safety of turnouts and Class B foam and could not reasonably discover the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in turnouts and Class B foam, nor Defendants' deception with respect to the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in turnouts and Class B foam.

147.     PLAINTIFFS did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were concealing the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in turnouts and Class B foam. As alleged herein, the existence of hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in turnouts and Class B foam was material to PLAINTIFFS at all relevant times.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

148.    Defendants did not fully disclose the seriousness of the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in turnouts and Class B foam, but instead ignored and/or concealed the defect from firefighters, including MR. HORTON, PLAINTIFFS, or the public, and refused to provide safe alternatives to PFAS or PFAS-containing materials in turnouts and Class B foam.

149.    At all times, Defendants are and were under a continuous duty to disclose to firefighters, including MR. HORTON, PLAINTIFFS, the public and their consumers, the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in turnouts and Class B foam.

150.    Defendants knowingly, actively, and affirmatively concealed the facts alleged herein. Firefighters, including MR. HORTON, and PLAINTIFFS reasonably relied on Defendants' knowing, active, and affirmative concealment.

151.    For these reasons, any and all applicable statutes of limitations have been tolled as a consequence of Defendants' ongoing knowledge, active concealment, and denial of the facts alleged herein.

**B. Estoppel**

152.    Defendants were and are under a continuous duty to disclose to their consumers, firefighters, including FIRE MARHSL HORTON, and PLAINTIFFS the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in Class B foam and turnouts.

153.    Instead, Defendants actively concealed the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS and PFAS-containing materials in Class B foam and turnouts; and knowingly made misrepresentations about the quality, reliability, characteristics, safety and performance of Class B foam and turnouts.

154.    Consumers, firefighters, including FIRE MARHSL HORTON, and PLAINTIFFS reasonably relied upon Defendants' knowing and affirmative misrepresentations, and/or active concealment, of these facts.

155.    Based on the foregoing, Defendants are estopped from relying on any and all

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

43

1   applicable statutes of limitations in defense of this action.

2       **C. Discovery Rule**

3       156.    Firefighters, including FIRE MARSHAL HORTON, had no ability to discern or

4   suspect that the hazardous toxicity, persistence, and bioaccumulation associated with the use of

5   PFAS or PFAS-containing materials in Class B foam and turnouts were a substantial cause of

6   their injuries.

7       157.    Accordingly, Defendants are precluded by the Discovery Rule and/or doctrine of

8   fraudulent concealment, and/or the doctrine of estoppel from relying upon any and all applicable

9   statutes of limitations.

10              **FIRST CAUSE OF ACTION**

11          **STRICT LIABILITY - DESIGN DEFECT**

12      158.    The PLAINTIFFS assert the following cause of action against all Defendants,

13  including DOES 1-100.

14      159.    PLAINTIFFS incorporate by reference all prior paragraphs of this complaint, as

15  though fully set forth herein.

16      160.    Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or

17  entities they have acquired, have engaged in the business of designing, formulating,

18  manufacturing, labeling, marketing, promoting, advertising, distributing, supplying, and/or

19  selling of turnouts and/or Class B foam and through that conduct have knowingly placed PFAS-

20  containing products into the stream of commerce with full knowledge that they were sold to fire

21  departments or to companies that sold turnouts and/or Class B foam to fire departments for use

22  by firefighters such as FIRE MARSHAL HORTON, who are exposed to PFAS through ordinary

23  and foreseeable uses for the purpose of firefighting activities and training.

24      161.    Defendants intended that the turnouts and/or Class B foam they were

25  manufacturing, selling, distributing, supplying, promoting, and or selling would be used by

26  firefighters, including FIRE MARSHAL HORTON, without any substantial change in the

27  condition of the products from when they were initially manufactured, sold, distributed, and

28  marketed by Defendants. Turnouts and/or Class B foam were not safe for use by firefighters

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

44

COMPLAINT

1   even when used as directed by the manufacturer and for its intended purpose for firefighting

2   activities which include training, extinguishment, ventilation, search-and-rescue, salvage,

3   containment, and overhaul.

4       162.    Further, knowing of the dangerous and hazardous properties of turnouts and Class

5   B foam, Defendants could have manufactured, marketed, distributed, and sold alternative

6   designs or formulations of turnouts and/or Class B foam that did not contain PFAS. These

7   alternative designs and/or formulations were already available, practical, similar in cost, and

8   technologically feasible.

9       163.    The use of these alternative designs would have reduced or prevented the

10  reasonably foreseeable harm to firefighters, including FIRE MARSHAL HORTON, that was

11  caused by the Defendants' manufacture, marketing, and sale of turnouts and/or Class B foam

12  containing PFAS and PFAS-containing materials.

13      164.    Additionally, the turnouts and/or Class B foam that were designed, manufactured,

14  marketed, tested, advertised, marketed, promoted, sold, and distributed by the Defendants

15  contained PFAS or PFAS-containing materials that were so toxic and unreasonably dangerous

16  to human health and the environment, with the toxic chemicals being so mobile and persistent,

17  that the act of designing, formulating, manufacturing, marketing, distributing, and selling these

18  products was unreasonably dangerous under the circumstances.

19      165.    The turnouts and/or Class B foam designed, manufactured, marketed, tested,

20  advertised, marketed, promoted, sold and distributed by the Defendants were dangerous and

21  defective in design or formulation because, at the time in which the products left the hands of

22  the manufacturer or distributors, the foreseeable risks exceeded the benefits associated with the

23  design or formulation of turnouts and/or Class B foam.

24      166.    The turnouts and/or Class B foam designed, manufactured, marketed, tested,

25  advertised, marketed, promoted, sold, and distributed by the Defendants were dangerous and

26  defective in design or formulation because, when the PFAS-containing products left the hands

27  of the manufacturer or distributors, said products were unreasonably dangerous, unreasonably

28  dangerous in normal use, and were more dangerous than an ordinary consumer-firefighter would

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA  90049

45

expect.

167.    The turnouts and/or Class B foam were in a defective condition and unsafe, and Defendants knew or had reason to know that these PFAS-containing products were defective and unsafe, especially when used in the form and manner as provided by Defendants. In particular, Defendants PFAS-containing products were defective in the following ways:

168.    When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or Class B foam were defective in design and formulation and as a result failed to meet ordinary users' expectations as to their safety and failed to perform as an ordinary user would expect.

169.    When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or Class B foam were defective in design and formulation, and as a result, dangerous to an extent beyond which an ordinary consumer-firefighter would anticipate.

170.    When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or Class B foam were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

171.    When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or Class B foam contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

172.    When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or Class B foam did not provide an adequate warning of the potential harm that could result from exposure to PFAS and/or emitted from the turnouts and/or Class B foam and, alternatively, did not have adequate instructions for safe use of the products.

173.    Exposure to PFAS presents a risk of grave and harmful side effects and injuries that outweigh any potential utility stemming from their use.

174.    Defendants knew or should have known at the time of manufacturing, selling, distributing, promoting or marketing their PFAS-containing turnouts and/or Class B foam that exposure to PFAS could result in cancer and other grave and serious illnesses and injuries as alleged herein.

BALABAN & SPELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

///

175.    The foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

176.    FIRE MARSHAL HORTON used these PFAS-containing products in the ways that Defendants intended them to be used.

177.    FIRE MARSHAL HORTON used these PFAS-containing products in ways that were foreseeable to Defendants.

178.    FIRE MARSHAL HORTON was exposed to PFAS by using Defendants' turnouts and/or Class B foam in the course of their employment, as described above, without knowledge of turnouts' and/or Class B foam's dangerous propensities.

179.    The design defect in turnouts and/or Class B foam containing PFAS exposed FIRE MARSHAL HORTON, to toxic levels of PFAS and therefore, was a substantial factor in causing his pre-death pain and suffering, following by his death and PLAINTIFFS' damages as described herein.

180.    As a direct and proximate result of their improper and inadequate design and formulation of turnouts and/or Class B foam containing PFAS, exposed FIRE MARSHAL HORTON to toxic levels of PFAS, which resulted in his cancer diagnosis and his ultimate death.

181.    As a direct and proximate result of their inadequate warnings and instructions, the turnouts and/or Class B foam containing PFAS, exposed FIRE MARSHAL HORTON to toxic levels of PFAS, which resulted in his cancer diagnosis and his ultimate death.

182.    As a direct and proximate result of Defendants' intentional, malicious and oppressive conduct, as well as their carelessness, negligence, gross negligence, their defective products and their failure to warn of dangers associated with their defective turnouts and/or Class B foam containing PFAS, FIRE MARSHAL HORTON suffered an excruciating death after prolonged pain, fear, suffering and emotional anguish throughout his cancer treatment until the time of his death, causing his beneficiaries, including MRS. HORTON, to suffer devastating grief, injuries, emotional pain and suffering, as well as economic damages, in an amount all to their general damages in excess of Twenty-Five Thousand Dollars ($25,000.00) which will be

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

47

1   stated according to proof, pursuant to California Code of Civil Procedure Section 425.10.

2       183.  On October 1, 2021, Governor Newsom signed SB 447. SB 447 amended Code of

3   Civil Procedure §377.34 to allow decedents' predeath pain and suffering to be recovered in a

4   survival action under certain circumstances, including as is the case here, in actions filed on or

5   after January 1, 2022.

6       184.  As a direct and proximate result of Defendants' intentional, malicious and

7   oppressive conduct, as well as their carelessness, negligence, gross negligence, their defective

8   products and their failure to warn of dangers associated with their defective turnouts and/or Class

9   B foam containing PFAS, FIRE MARSHAL HORTON suffered an excruciating death after

10  prolonged pain, fear, suffering and emotional anguish throughout his cancer treatment until the

11  time of his death, causing his beneficiaries, including MRS. HORTON, to suffer devastating

12  grief, injuries, emotional pain and suffering, including but not limited to the loss of comfort,

13  society, guidance, companionship, support, love and affection in an amount all to their general

14  damages in excess of Twenty-Five Thousand Dollars ($25,000.00) which will be stated

15  according to proof, pursuant to California Code of Civil Procedure Section 425.10.

16  **SECOND CAUSE OF ACTION**

17  **STRICT LIABILITY – FAILURE TO WARN**

18      185.  The PLAINTIFFS assert the following cause of action against all Defendants,

19  including DOES 1-100.

20      186.  PLAINTIFFS incorporate by reference all prior paragraphs of this complaint, as

21  though fully set forth herein.

22      187.  Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or

23  entities they have acquired, have engaged in the business of designing, formulating,

24  manufacturing, labeling, marketing, promoting, advertising, distributing, supplying, and/or

25  selling of turnouts and/or Class B foam containing PFAS or PFAS-containing materials and,

26  through that conduct, have knowingly placed PFAS-containing products into the stream of

27  commerce with full knowledge that they were sold to fire departments or to companies that sold

28  turnouts and/or Class B foam to fire departments for the use by firefighters such as FIRE

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD, STE. 345
LOS ANGELES, CA 90049

MARSHAL HORTON, who was exposed to PFAS through ordinary and foreseeable uses for the purpose of firefighting activities and training.

188.   The products complained of were designed, formulated, manufactured, marketed, sold, supplied and/or distributed by each of the Defendants and used by and/or in the vicinity of FIRE MARSHAL HORTON during his lifetime and/or he was exposed to PFAS while using turnouts and/or Class B foam in the ordinary course of performing his duties as a firefighter.

189.   Defendants expected that the PFAS-containing products they were manufacturing, selling, distributing, supplying, and/or promoting would reach firefighters, including FIRE MARSHAL HORTON, without any substantial change in the condition of the products from when they were initially designed, formulated, manufactured, marketed, sold, supplied and/or distributed by Defendants.

190.   Defendants knew or should have reasonably known that the manner in which they were designing, formulating, manufacturing, marketing, selling, supplying and/or distributing turnouts and/or Class B foam containing PFAS was hazardous to human health.

191.   The potential risks of using PFAS-containing products presented a substantial danger to firefighters, including FIRE MARSHAL HORTON, when the turnouts and/or Class B foam were used or worn in an intended or reasonably foreseeable way.

192.   FIRE MARSHAL HORTON used Class B foam and wore turnouts in the intended or reasonably foreseeable way in the ordinary course of performing his duties as a firefighters, including for fire suppression and fire suppression training.

193.   The turnouts and/or Class B foam manufactured, marketed, and sold by the Defendants were dangerous and defective because the foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

194.   Defendants' products were in a defective condition and unreasonably dangerous, in that turnouts and/or Class B foam which, by design, contain PFAS or PFAS-containing products, are deleterious, toxic, and highly harmful to firefighters, including FIRE MARSHAL HORTON.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD, STE. 345
LOS ANGELES, CA 90049

195. Defendants knew or should have reasonably known that exposure to PFAS was hazardous to human health, but:

    a. Did not provide an adequate warning of the potential harm that could result from exposure to PFAS or PFAS-containing materials in turnouts and/or Class B foam;

    b. Did not have adequate instructions for safe use of the products;

    c. Did not have warnings to persons, such as FIRE MARSHAL HORTON, who had been, or reasonably may have been, exposed to Defendants' turnouts and/or Class B foam, of their disease potential, the proper steps to take to reduce the harmful effects of previous exposure, the need to have periodic medical examinations including the giving of histories which revealed the details of the previous exposure, and the need to have immediate and vigorous medical treatment for all related adverse health effects;

    d. Did not manufacture, market, promote, distribute or sell reasonably comparable products not containing PFAS when it became feasible to design.

196. At the time of design, formulation, manufacture, marketing, promotion, sale, supply and/or distribution, Defendants could have provided warnings or instructions regarding the full and complete risks of turnouts and/or Class B foam containing PFAS or PFAS-containing materials, because Defendants knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

197. At all relevant time, Defendants' turnouts and/or Class B foam did not contain an adequate warning or caution statement, which was necessary.

198. FIRE MARSHAL HORTON was unaware of the defective and unreasonable dangers of Defendants' products at a time when such products were being used for the purposes for which they were intended, and FIRE MARSHAL HORTON was exposed to PFAS released from the Defendants' turnouts and/or Class B foam.

Balaban & Spielberger LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

199.    FIRE MARSHAL HORTON did not and could not have known that the use of turnouts and/or Class B foam in the ordinary course of performing their duties as firefighters could be hazardous to their health, including but not limited to bio-accumulate in the blood, and cause serious health effects, including cancer.

200.    Defendants knew that the use of turnouts and/or Class B foam, even when used as instructed by Defendants, subjected FIRE MARSHAL HORTON and others to a substantial risk of harm and yet, failed to adequately warn firefighters, including FIRE MARSHAL HORTON, the EPA, their consumers or the public.

201.    As a result of their inadequate warnings, Defendants' turnouts and/or Class B foam were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used or worn by firefighters, including by FIRE MARSHAL HORTON.

202.    The lack of adequate and sufficient warnings was a substantial factor in causing the FIRE MARSHAL HORTON's pre-death pain and suffering, followed by his death and PLAINTIFFS' damages as described herein.

203.    As a direct and proximate result of their improper and inadequate design and formulation of turnouts and/or Class B foam containing PFAS, exposed FIRE MARSHAL HORTON to toxic levels of PFAS, which resulted in his cancer diagnosis and his ultimate death.

204.    As a direct and proximate result of their inadequate warnings and instructions, the turnouts and/or Class B foam containing PFAS, exposed FIRE MARSHAL HORTON to toxic levels of PFAS, which resulted in his cancer diagnosis and his ultimate death.

205.    As a direct and proximate result of Defendants' intentional, malicious and oppressive conduct, as well as their carelessness, negligence, gross negligence, their defective products and their failure to warn of dangers associated with their defective turnouts and/or Class B foam containing PFAS, FIRE MARSHAL HORTON suffered an excruciating death after prolonged pain, fear, suffering and emotional anguish throughout his cancer treatment until the time of his death, causing his beneficiaries, including MRS. HORTON, to suffer devastating grief, injuries, emotional pain and suffering, as well as economic damages, in an amount all to

51

their general damages in excess of Twenty-Five Thousand Dollars ($25,000.00) which will be stated according to proof, pursuant to California Code of Civil Procedure Section 425.10.

206.    On October 1, 2021, Governor Newsom signed SB 447. SB 447 amended Code of Civil Procedure §377.34 to allow decedents' predeath pain and suffering to be recovered in a survival action under certain circumstances, including as is the case here, in actions filed on or after January 1, 2022.

207.    As a direct and proximate result of Defendants' intentional, malicious and oppressive conduct, as well as their carelessness, negligence, gross negligence, their defective products and their failure to warn of dangers associated with their defective turnouts and/or Class B foam containing PFAS, FIRE MARSHAL HORTON suffered an excruciating death after prolonged pain, fear, suffering and emotional anguish throughout his cancer treatment until the time of his death, causing his beneficiaries, including MRS. HORTON, to suffer devastating grief, injuries, emotional pain and suffering, including but not limited to the loss of comfort, society, guidance, companionship, support, love and affection in an amount all to their general damages in excess of Twenty-Five Thousand Dollars ($25,000.00) which will be stated according to proof, pursuant to California Code of Civil Procedure Section 425.10.

## THIRD CAUSE OF ACTION

## NEGLIGENCE

208.    The PLAINTIFFS assert the following cause of action against all Defendants, including DOES 1-100.

209.    PLAINTIFFS incorporate by reference all prior paragraphs of this complaint as though fully set forth herein.

210.    Defendants owed a duty of care to their consumer, customers, including the firefighters such as FIRE MARSHAL HORTON, and PLAINTIFFS that were commensurate with the inherently dangerous, harmful, injurious, bio-persistent, environmentally-persistent, toxic, and bio-accumulative nature of Class B foam and turnouts containing PFAS or PFAS-containing materials.

211.    Defendants had a duty to exercise reasonable care in the design, research, testing,

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD, STE. 345
LOS ANGELES, CA 90049

manufacture, marketing, formulation, supply, promotion, sale, labeling, training of users, production of information materials, use and/or distribution of Class B foam and/or turnouts into the stream of commerce, including a duty of care to ensure the PFAS did not infiltrate, persist in, accumulate in the blood and/or bodies of the firefighters, including FIRE MARSHAL HORTON, and including a duty to assure their products would not cause users to suffer unreasonable, dangerous side effects.

212.    Defendants had a duty to exercise reasonable care to ensure that Class B foam and/or turnouts were manufactured, marketed, and sold in such a way as to ensure that the end users of Class B foam and/or turnouts were aware of the potential harm PFAS can cause to human health, and were advised to use it in such a way that would not be hazardous to their health.

213.    Defendants had a duty to warn of the hazards associated with PFAS and PFAS-containing materials and were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about the Class B foam and/or turnouts. However, Defendants knowingly and intentionally failed to do so.

214.    Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, formulating, marketing, testing, promotion, supply, sale, and/or distribution of their PFAS chemicals and PFAS-containing products in the regular course of business, in that Defendants knew or should have known that use and exposure to PFAS and PFAS-containing materials was hazardous to human health and created a high risk of unreasonable, dangerous side effects, including but not limited to severe personal injuries, as described herein.

215.    Defendants also knew or should have known that the manner in which they were designing, formulating, manufacturing, marketing, promoting, distributing, and/or selling Class B foam and/or turnouts containing PFAS or PFAS-containing materials was hazardous to human health, bio-accumulated in the blood, and caused serious health effects, including cancer.

216.    Defendants negligently and deceptively underreported, underestimated, downplayed the serious health dangers of the Class B foam and/or turnouts products.

217.    Defendants negligently, carelessly and recklessly recommended application and

disposal techniques for PFAS and/or for products containing PFAS that directly and proximately caused harm to FIRE MARSHAL HORTON and PLAINTIFFS.

218.    Defendants knew or should have known that firefighters working with and using Class B foam and/or turnouts products would be exposed to PFAS.

219.    At all times material, FIRE MARSHAL HORTON inhaled, ingested and/or absorbed dermally hazardous PFAS contaminants released from the Defendants' Class B foam and/or turnouts.

220.    FIRE MARSHAL HORTON's exposure to Defendant's Class B foam and/or turnouts, which were connected to and incidental to Defendants' manufacture, design, sale, supply and/or distribution of its PFAS-containing products, was harmful and substantially increased the risk of injuries to FIRE MARSHAL HORTON, and did cause injuries to FIRE MARSHAL HORTON, including his ultimate death.

221.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, distributing and selling Class B foam and/or turnouts containing PFAS or PFAS-containing materials would result in harm to firefighters, including to FIRE MARSHAL HORTON, as a result of using Class B foam and/or turnouts in the ordinary course of performing their duties as firefighters.

222.    Defendants knew, foresaw, anticipated, and/or should have foreseen, anticipated, and/or known that the design, engineering, manufacture, fabrication, sale, release, handling, use, and/or distribution of PFAS or PFAS-containing materials in Class B foam and turnouts, and/or Defendants' other acts and/or omissions as described in this complaint, could likely result in PFAS exposure to firefighters, including to FIRE MARSHAL HORTON, the persistence and accumulation of toxic and harmful PFAS in their blood and/or bodies, and cause injuries to firefighters, including to FIRE MARSHAL HORTON, as herein alleged.

223.    Despite knowing, anticipating, and/or foreseeing the bio-persistent, bio-accumulative, toxic, and/or otherwise harmful and/or injurious nature of PFAS materials, Defendants, their agents, servants, and/or employees, committed negligent acts and/or omissions that resulted in PFAS exposure to firefighters, including FIRE MARSHAL HORTON.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

224. Defendants, through their acts and/or omissions as described in this complaint, breached their duties to FIRE MARSHAL HORTON.

225. It was reasonably foreseeable to Defendants that firefighters, including FIRE MARSHAL HORTON would likely suffer the injuries and harm described in this complaint by virtue of Defendants' breach of their duty and failure to exercise ordinary care, as described herein.

226. As a direct and proximate result of their foregoing acts, omissions and negligence, FIRE MARSHAL HORTON was exposed to toxic levels of PFAS, which resulted in his cancer diagnosis and his ultimate death.

227. As a direct and proximate result of their foregoing acts, omissions and negligence and inadequate warnings and instructions, the turnouts and/or Class B foam containing PFAS, exposed FIRE MARSHAL HORTON to toxic levels of PFAS, which resulted in his cancer diagnosis and his ultimate death.

228. As a direct and proximate result of Defendants' negligence, their defective products and their failure to warn of dangers associated with their defective turnouts and/or Class B foam containing PFAS, FIRE MARSHAL HORTON suffered an excruciating death after prolonged pain, fear, suffering and emotional anguish throughout his cancer treatment until the time of his death, causing his beneficiaries, including MRS. HORTON, to suffer devastating grief, injuries, emotional pain and suffering, as well as economic damages, in an amount all to their general damages in excess of Twenty-Five Thousand Dollars ($25,000.00) which will be stated according to proof, pursuant to California Code of Civil Procedure Section 425.10.

229. On October 1, 2021, Governor Newsom signed SB 447. SB 447 amended Code of Civil Procedure §377.34 to allow decedents' predeath pain and suffering to be recovered in a survival action under certain circumstances, including as is the case here, in actions filed on or after January 1, 2022.

230. As a direct and proximate result of Defendants' negligence, their defective products and their failure to warn of dangers associated with their defective turnouts and/or Class B foam containing PFAS, FIRE MARSHAL HORTON suffered an excruciating death after

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

prolonged pain, fear, suffering and emotional anguish throughout his cancer treatment until the time of his death, causing his beneficiaries, including MRS. HORTON, to suffer devastating grief, injuries, emotional pain and suffering, including but not limited to the loss of comfort, society, guidance, companionship, support, love and affection in an amount all to their general damages in excess of Twenty-Five Thousand Dollars ($25,000.00) which will be stated according to proof, pursuant to California Code of Civil Procedure Section 425.10.

## FOURTH CAUSE OF ACTION

### WRONGFUL DEATH

231.    The PLAINTIFFS assert the following cause of action against all Defendants, including DOES 1-100.

232.    PLAINTIFFS incorporate by reference all prior paragraphs of this complaint, as though fully set forth herein.

233.    Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or entities they have acquired, have engaged in the business of designing, formulating, manufacturing, labeling, marketing, promoting, advertising, distributing, supplying, and/or selling of turnouts and/or Class B foam containing PFAS or PFAS-containing materials and, through that conduct, have knowingly placed PFAS-containing products into the stream of commerce with full knowledge that they were sold to fire departments or to companies that sold turnouts and/or Class B foam to fire departments for the use by firefighters such as FIRE MARSHAL HORTON, who was exposed to PFAS through ordinary and foreseeable uses for the purpose of firefighting activities and training.

234.    The products complained of were designed, formulated, manufactured, marketed, sold, supplied and/or distributed by each of the Defendants and used by and/or in the vicinity of FIRE MARSHAL HORTON during his lifetime and/or he was exposed to PFAS while using turnouts and/or Class B foam in the ordinary course of performing his duties as a firefighter.

235.    Defendants expected that the PFAS-containing products they were manufacturing, selling, distributing, supplying, and/or promoting would reach firefighters, including FIRE MARSHAL HORTON, without any substantial change in the condition of the products from

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

1    when they were initially designed, formulated, manufactured, marketed, sold, supplied and/or

2    distributed by Defendants.

3        236.    Defendants knew or should have reasonably known that the manner in which they

4    were designing, formulating, manufacturing, marketing, selling, supplying and/or distributing

5    turnouts and/or Class B foam containing PFAS was hazardous to human health.

6        237.    The potential risks of using PFAS-containing products presented a substantial

7    danger to firefighters, including FIRE MARSHAL HORTON, when the turnouts and/or Class B

8    foam were used or worn in an intended or reasonably foreseeable way.

9        238.    FIRE MARSHAL HORTON used Class B foam and wore turnouts in the intended

10   or reasonably foreseeable way in the ordinary course of performing his duties as a firefighters,

11   including for fire suppression and fire suppression training.

12       239.    The turnouts and/or Class B foam manufactured, marketed, and sold by the

13   Defendants were dangerous and defective because the foreseeable risk of harm could have been

14   reduced or eliminated by the adoption of a reasonable, alternative design that was not

15   unreasonably dangerous.

16       240.    Defendants' products were in a defective condition and unreasonably dangerous,

17   in that turnouts and/or Class B foam which, by design, contain PFAS or PFAS-containing

18   products, are deleterious, toxic, and highly harmful to firefighters, including FIRE MARSHAL

19   HORTON.

20       241.    Defendants knew or should have reasonably known that exposure to PFAS was

21   hazardous to human health, but:

22       a.    Did not provide an adequate warning of the potential harm that could result

23       from exposure to PFAS or PFAS-containing materials in turnouts and/or

24       Class B foam;

25       b.    Did not have adequate instructions for safe use of the products;

26       c.    Did not have warnings to persons, such as FIRE MARSHAL HORTON,

27       who had been, or reasonably may have been, exposed to Defendants'

28       turnouts and/or Class B foam, of their disease potential, the proper steps to

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

take to reduce the harmful effects of previous exposure, the need to have periodic medical examinations including the giving of histories which revealed the details of the previous exposure, and the need to have immediate and vigorous medical treatment for all related adverse health effects;

d. Did not manufacture, market, promote, distribute or sell reasonably comparable products not containing PFAS when it became feasible to design.

242. At the time of design, formulation, manufacture, marketing, promotion, sale, supply and/or distribution, Defendants could have provided warnings or instructions regarding the full and complete risks of turnouts and/or Class B foam containing PFAS or PFAS-containing materials, because Defendants knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

243. At all relevant time, Defendants' turnouts and/or Class B foam did not contain an adequate warning or caution statement, which was necessary.

244. FIRE MARSHAL HORTON was unaware of the defective and unreasonable dangers of Defendants' products at a time when such products were being used for the purposes for which they were intended, and FIRE MARSHAL HORTON was exposed to PFAS released from the Defendants' turnouts and/or Class B foam.

245. FIRE MARSHAL HORTON did not and could not have known that the use of turnouts and/or Class B foam in the ordinary course of performing their duties as firefighters could be hazardous to their health, including but not limited to bio-accumulate in the blood, and cause serious health effects, including cancer.

246. Defendants knew that the use of turnouts and/or Class B foam, even when used as instructed by Defendants, subjected FIRE MARSHAL HORTON and others to a substantial risk of harm and yet, failed to adequately warn firefighters, including FIRE MARSHAL HORTON, the EPA, their consumers or the public.

247. As a result of their inadequate warnings, Defendants' turnouts and/or Class B

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

COMPLAINT

foam were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used or worn by firefighters, including by FIRE MARSHAL HORTON.

248.    The lack of adequate and sufficient warnings was a substantial factor in causing the FIRE MARSHAL HORTON's pre-death pain and suffering, followed by his death and PLAINTIFFS' damages as described herein.

249.    As a direct and proximate result of their improper and inadequate design and formulation of turnouts and/or Class B foam containing PFAS, exposed FIRE MARSHAL HORTON to toxic levels of PFAS, which resulted in his cancer diagnosis and his ultimate death.

250.    As a direct and proximate result of their inadequate warnings and instructions, the turnouts and/or Class B foam containing PFAS, exposed FIRE MARSHAL HORTON to toxic levels of PFAS, which resulted in his cancer diagnosis and his ultimate death.

251.    As a direct and proximate result of Defendants' intentional, malicious and oppressive conduct, as well as their carelessness, negligence, gross negligence, their defective products and their failure to warn of dangers associated with their defective turnouts and/or Class B foam containing PFAS, FIRE MARSHAL HORTON suffered an excruciating death after prolonged pain, fear, suffering and emotional anguish throughout his cancer treatment until the time of his death, causing his beneficiaries, including MRS. HORTON, to suffer devastating grief, injuries, emotional pain and suffering, as well as economic damages, in an amount all to their general damages in excess of Twenty-Five Thousand Dollars ($25,000.00) which will be stated according to proof, pursuant to California Code of Civil Procedure Section 425.10.

252.    On October 1, 2021, Governor Newsom signed SB 447. SB 447 amended Code of Civil Procedure §377.34 to allow decedents' predeath pain and suffering to be recovered in a survival action under certain circumstances, including as is the case here, in actions filed on or after January 1, 2022.

253.    As a direct and proximate result of Defendants' intentional, malicious and oppressive conduct, as well as their carelessness, negligence, gross negligence, their defective products and their failure to warn of dangers associated with their defective turnouts and/or Class

B foam containing PFAS, FIRE MARSHAL HORTON suffered an excruciating death after prolonged pain, fear, suffering and emotional anguish throughout his cancer treatment until the time of his death, causing his beneficiaries, including MRS. HORTON, to suffer devastating grief, injuries, emotional pain and suffering, including but not limited to the loss of comfort, society, guidance, companionship, support, love and affection in an amount all to their general damages in excess of Twenty-Five Thousand Dollars ($25,000.00) which will be stated according to proof, pursuant to California Code of Civil Procedure Section 425.10.

## **FIFHT CAUSE OF ACTION**

### **SURVIVAL ACTION**

254. The PLAINTIFFS assert the following cause of action against all Defendants, including DOES 1-100.

255. PLAINTIFFS incorporate by reference all prior paragraphs of this complaint, as though fully set forth herein.

256. Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or entities they have acquired, have engaged in the business of designing, formulating, manufacturing, labeling, marketing, promoting, advertising, distributing, supplying, and/or selling of turnouts and/or Class B foam containing PFAS or PFAS-containing materials and, through that conduct, have knowingly placed PFAS-containing products into the stream of commerce with full knowledge that they were sold to fire departments or to companies that sold turnouts and/or Class B foam to fire departments for the use by firefighters such as FIRE MARSHAL HORTON, who was exposed to PFAS through ordinary and foreseeable uses for the purpose of firefighting activities and training.

257. The products complained of were designed, formulated, manufactured, marketed, sold, supplied and/or distributed by each of the Defendants and used by and/or in the vicinity of FIRE MARSHAL HORTON during his lifetime and/or he was exposed to PFAS while using turnouts and/or Class B foam in the ordinary course of performing his duties as a firefighter.

258. Defendants expected that the PFAS-containing products they were manufacturing, selling, distributing, supplying, and/or promoting would reach firefighters, including FIRE

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD, STE. 345
LOS ANGELES, CA 90049

MARSHAL HORTON, without any substantial change in the condition of the products from when they were initially designed, formulated, manufactured, marketed, sold, supplied and/or distributed by Defendants.

259.    Defendants knew or should have reasonably known that the manner in which they were designing, formulating, manufacturing, marketing, selling, supplying and/or distributing turnouts and/or Class B foam containing PFAS was hazardous to human health.

260.    The potential risks of using PFAS-containing products presented a substantial danger to firefighters, including FIRE MARSHAL HORTON, when the turnouts and/or Class B foam were used or worn in an intended or reasonably foreseeable way.

261.    FIRE MARSHAL HORTON used Class B foam and wore turnouts in the intended or reasonably foreseeable way in the ordinary course of performing his duties as a firefighters, including for fire suppression and fire suppression training.

262.    The turnouts and/or Class B foam manufactured, marketed, and sold by the Defendants were dangerous and defective because the foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

263.    Defendants' products were in a defective condition and unreasonably dangerous, in that turnouts and/or Class B foam which, by design, contain PFAS or PFAS-containing products, are deleterious, toxic, and highly harmful to firefighters, including FIRE MARSHAL HORTON.

264.    Defendants knew or should have reasonably known that exposure to PFAS was hazardous to human health, but:

    a.  Did not provide an adequate warning of the potential harm that could result from exposure to PFAS or PFAS-containing materials in turnouts and/or Class B foam;

    b.  Did not have adequate instructions for safe use of the products;

    c.  Did not have warnings to persons, such as FIRE MARSHAL HORTON, who had been, or reasonably may have been, exposed to Defendants'

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

turnouts and/or Class B foam, of their disease potential, the proper steps to take to reduce the harmful effects of previous exposure, the need to have periodic medical examinations including the giving of histories which revealed the details of the previous exposure, and the need to have immediate and vigorous medical treatment for all related adverse health effects;

d. Did not manufacture, market, promote, distribute or sell reasonably comparable products not containing PFAS when it became feasible to design.

265. At the time of design, formulation, manufacture, marketing, promotion, sale, supply and/or distribution, Defendants could have provided warnings or instructions regarding the full and complete risks of turnouts and/or Class B foam containing PFAS or PFAS-containing materials, because Defendants knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

266. At all relevant time, Defendants' turnouts and/or Class B foam did not contain an adequate warning or caution statement, which was necessary.

267. FIRE MARSHAL HORTON was unaware of the defective and unreasonable dangers of Defendants' products at a time when such products were being used for the purposes for which they were intended, and FIRE MARSHAL HORTON was exposed to PFAS released from the Defendants' turnouts and/or Class B foam.

268. FIRE MARSHAL HORTON did not and could not have known that the use of turnouts and/or Class B foam in the ordinary course of performing their duties as firefighters could be hazardous to their health, including but not limited to bio-accumulate in the blood, and cause serious health effects, including cancer.

269. Defendants knew that the use of turnouts and/or Class B foam, even when used as instructed by Defendants, subjected FIRE MARSHAL HORTON and others to a substantial risk of harm and yet, failed to adequately warn firefighters, including FIRE MARSHAL HORTON, the EPA, their consumers or the public.

270.    As a result of their inadequate warnings, Defendants' turnouts and/or Class B foam were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used or worn by firefighters, including by FIRE MARSHAL HORTON.

271.    The lack of adequate and sufficient warnings was a substantial factor in causing the FIRE MARSHAL HORTON's pre-death pain and suffering, followed by his death and PLAINTIFFS' damages as described herein.

272.    As a direct and proximate result of their improper and inadequate design and formulation of turnouts and/or Class B foam containing PFAS, exposed FIRE MARSHAL HORTON to toxic levels of PFAS, which resulted in his cancer diagnosis and his ultimate death.

273.    As a direct and proximate result of their inadequate warnings and instructions, the turnouts and/or Class B foam containing PFAS, exposed FIRE MARSHAL HORTON to toxic levels of PFAS, which resulted in his cancer diagnosis and his ultimate death.

274.    As a direct and proximate result of Defendants' intentional, malicious and oppressive conduct, as well as their carelessness, negligence, gross negligence, their defective products and their failure to warn of dangers associated with their defective turnouts and/or Class B foam containing PFAS, FIRE MARSHAL HORTON suffered an excruciating death after prolonged pain, fear, suffering and emotional anguish throughout his cancer treatment until the time of his death, causing his beneficiaries, including MRS. HORTON, to suffer devastating grief, injuries, emotional pain and suffering, as well as economic damages, in an amount all to their general damages in excess of Twenty-Five Thousand Dollars ($25,000.00) which will be stated according to proof, pursuant to California Code of Civil Procedure Section 425.10.

275.    On October 1, 2021, Governor Newsom signed SB 447. SB 447 amended Code of Civil Procedure §377.34 to allow decedents' predeath pain and suffering to be recovered in a survival action under certain circumstances, including as is the case here, in actions filed on or after January 1, 2022.

276.    As MR. HORTON's sole successor, MRS. HORTON seeks all damages permitted under survival claims, including, but not limited to those set forth in California Code of Civil

Procedure § 377.10, et seq. MRS. HORTON succeeds to all damages related to those causes of action, as well as any other claims as MRS. HORTON may have as MR. HORTON's successor.

277. As a direct and proximate result of Defendants' intentional, malicious and oppressive conduct, as well as their carelessness, negligence, gross negligence, their defective products and their failure to warn of dangers associated with their defective turnouts and/or Class B foam containing PFAS, FIRE MARSHAL HORTON suffered an excruciating death after prolonged pain, fear, suffering and emotional anguish throughout his cancer treatment until the time of his death, causing his beneficiaries, including MRS. HORTON, to suffer devastating grief, injuries, emotional pain and suffering, including but not limited to the loss of comfort, society, guidance, companionship, support, love and affection in an amount all to their general damages in excess of Twenty-Five Thousand Dollars ($25,000.00) which will be stated according to proof, pursuant to California Code of Civil Procedure Section 425.10.

## SIXTH CAUSE OF ACTION

### LOSS OF CONSORTIUM

278. The PLAINTIFFS assert the following cause of action against all Defendants, including DOES 1-100.

279. This cause of action is asserted against all Defendants on behalf of Plaintiff KAYLA DAVIS HORTON, (hereinafter "MRS. HORTON" as previously defined in paragraph).

280. Plaintiff MRS. HORTON incorporates by reference all prior paragraphs of this complaint, as though fully set forth herein.

281. MRS. HORTON and FIRE MARSHAL HORTON were lawfully married up to the time of FIRE MARSHAL HORTON's death.

282. As alleged above, and as a result of the Defendants' conduct, FIRE MARSHAL HORTON suffered prolonged battle with cancer, pre-death pain and suffering and ultimately died from cancer.

283. As a proximate result of her husbands' injuries sustained from the exposure and use of Class B foam and/or turnouts in the ordinary course of performing his firefighting duties, MRS. HORTON was deprived of love, companionship, comfort, care, assistance, protection,

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

affection, society, moral support, sexual relations and conjugal fellowship, during her husbands' illnesses, and treatment, and since his death, which deprivation has caused, continues to cause, and in the future is expected to cause MRS. HORTON emotional distress, loss of consortium, love, society, comfort and affection, and has thereby sustained pecuniary losses, which losses will be stated according to proof at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully prays that this Court grant the following relief:

1. For special damages according to proof;

2. For general damages according to proof;

3. For punitive damages on behalf of the successor in interest to the HORTON ESTATE.

4. For prejudgment interest, according to proof;

5. For costs of suit incurred herein; and

6. For such other and further relief as the court may deem just and proper.


DATED:  November 1, 2024                    BALABAN & SPIELBERGER, LLP

By:  _____
                    Daniel K. Balaban
                    Andrew J. Spielberger
                    Kahren Harutyunyan
                    Attorneys for Plaintiff, KAYLA DAVIS HORTON

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA. 90049

1

## **DEMAND FOR JURY TRIAL**

2          Plaintiff, KAYLA HORTON, hereby demands a jury trial for each cause of action for

3    which they are entitled a jury trial.

4

5    DATED:  November 1, 2024                    BALABAN & SPIELBERGER, LLP

6

7                                                      By:  _____

8                                                            Daniel K. Balaban
                                                            Andrew J. Spielberger
                                                            Kahren Harutyunyan
9                                                            Attorneys for Plaintiff, KAYLA DAVIS HORTON

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD, STE. 345
LOS ANGELES, CA  90049

66
COMPLAINT